Randolph C. LYON, Libelant,

v.

UNITED STATES of America,
Respondent,
and
Project Construction Corp., Respondent-
Impleaded.

No. 19985.

United States District Court
E. D. New York.

June 30, 1958.

Harry H. Lipsig, New York City, for libelant.

Cornelius W. Wickersham, U. S. Atty. for Eastern Dist. of N. Y., Brooklyn, N. Y., for United States, by Walter L. Hopkins, New York City.

Arthur V. Lynch, New York City, for Project Const. Corp., by Purdy, Lamb & Catoggio, Edmund F. Lamb, New York City.

BYERS, Chief Judge. · · ·

The libelant Lyon's cause arises from his fall of 35 feet from the boat deck of a ship on which he was working, to

the dock alongside to port, on June 2, 1952; many of the material facts are not in dispute.

He was a ship fitter in the employ of Project Construction Corporation (Project) which was under a general contract with the United States to make major alterations upon the U.S.N.S. General M. B. Stewart (Stewart). The work was done at Pier 45, Brooklyn, New York, and the important question for decision is whether legal responsibility for the unfortunate mishap can be visited upon the respondent which owned and operated the ship.

The contract (No. MST 222) was for a major alteration of the ship to convert into a passenger carrier for the families of overseas service men, from a transport for prisoners of war. The cost of the entire job was upwards of $1,500,000 and required 95 working days for completion.

Major alterations were required, including Coast Guard repairs, and safety at sea changes. Among the latter was an increase of from ten to twelve lifeboats, (an equal number on each side) which meant that provision had to be made for six, in the space formerly occupied by five on each side of the boat deck. Order No. 145 embodied the requirements of the relevant specifications. The change was effected by aligning the new stations at an angle to the side of the ship, instead of fore and aft. This necessitated resetting the entire gear involved in the functioning of the davits, and the replacing of the bases of the winches to accommodate the new positions so established. The precise job on which Lyon was working, was setting the outboard base of the No. 4 lifeboat (port) winch to accommodate it to the camber of the deck; to do this he used a six foot crowbar which was nosed under the outboard edge of the base, while resting upon a loose angle iron used as a fulcrum in raising the base to admit of the insertion of wedges to accomplish the leveling.

In performing his task he had to stand in a deck space that was from 12 to 15 inches measured from the edge of the deck. He bore down upon the crowbar, which slipped out of its engagement with the base of the winch; he lost his balance as the result of that slipping, and fell outboard; (he was facing 45° aft as he began his task) he instinctively tried to grasp something, but could not, and thus fell to the pier.

The reason why he could grasp nothing was that the ship's rail at that part of the deck had been removed some fourteen days or so previously, as a necessary step in prosecuting this rearrangement of the lifeboats and their fittings. No effective temporary barrier had been erected to serve in the place of the removed rail, and the question for decision is whether the United States as owner of the ship, can be held to answer for that condition.

It is conceded that if there was a duty to replace the rail by a temporary expedient, such as a rope or cable strung across the opening; or by rigging a staging over-side upon which Lyon could have stood, the duty was that of Project.

The libelant asserts (A) unseaworthiness; or (B) negligence on the part of the respondent for not providing a safe place for him to work.

The testimony yields the following

### Findings of Fact:

1. The Stewart was not unseaworthy in respect of any duty which it (i. e., respondent) owed to Lyon.

### Comment:

Lyon was a business invitee in the employ of Project. His occupation was not that of a seaman either in fact, or judicial theory. See Rich v. U. S., 2 Cir., 192 F.2d 858; Berge v. National Bulk Carriers Corp., D.C., 148 F.Supp. 608; 2 Cir., 251 F.2d 717, certiorari denied, 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed. 2d 1066. He was engaged as a rigger in a repair job on a ship that was afloat, but not in operation. Her engines were being overhauled and repaired, and could not function on June 2, 1952, or for many days prior.

To exact from her owner anything that could even by remote suggestion be termed seaworthiness, would be to impute to that expression a meaning which even the most ardent pursuit of underwriting liability would not justify.

It was required of the Government that the ship be a reasonably safe floating marine structure which was in need of the substantial alterations and changes in equipment that have been described.

 There was no default in that undertaking; this section of the railing was removed by the prime contractor having the work in charge, as a necessary step in the performance of his contract. To argue that the removal of the rail rendered the ship unseaworthy, is the same thing as saying that to increase the equipment for lifeboats from ten to twelve, was to do that very thing, even though it could not otherwise be accomplished. The argument cannot prevail. The Government had the right to convert the ship from one type of service to another, and to accomplish that purpose by such means as were requisite. There was no stage in that process which changed a seaworthy ship into an unseaworthy one.

The statement of Mr. Justice Jackson in his dissenting opinion in the Pope & Talbot v. Hawn case (346 U.S. 406, at page 423, 74 S.Ct. 202, at page 212, 98 L.Ed. 143) is apposite:

"If everything were shipshape, he (the owner) would not need the services of the repairmen."

The libelant relies much upon Pioneer S.S. Co. v. Hill, 6 Cir., 227 F.2d 262. That decision was based upon a dubious finding that the owner had retained general control of the vessel undergoing repairs. That is not thought to be the condition revealed by the evidence in this case.

Moreover, there could be no contention that Lyon even constructively relied upon a theoretical warranty of seaworthiness in entering into the performance of his tasks. As to this aspect of the case, see Bruszewski v. Isthmian S.S. Co., 3 Cir., 163 F.2d 720; Byars v. Moore-McCormack Lines, 2 Cir., 155 F.2d 587.

2. The respondent was not negligent in connection with the removal of the railing, or in failing to require that a temporary substitute be provided, i. e., it had no control over the methods employed by Project in performing its contract.

Comment:

 It is not argued for libelant that any negligence is involved in the removal of the rail, because its presence would have rendered impossible the making of the changes in the deck that were required for the placing in position of the gear and equipment of the extra lifeboat. So much appears from the testimony of all witnesses who testified on the subject.

The contention however that the respondent was negligent in not requiring the contractor to provide a temporary barrier, or staging, it the gist of libelant's cause. The subject turns upon the question of control which the Government exercised, or was required to exercise, in connection with the performance of the contract with Project.

It is necessary first to turn to the provisions of the contract:

Art. 4 requires Project to furnish material, labor, services, equipment, etc. as may be necessary to accomplish the work specified.

Art. 5 permits the Government also to furnish materials, supplies, tools, etc..

It does not appear that any such right was exercised generally or with respect to Job Order #145.

In Art. 5f, it appears that Project was required to place proper safeguards for the prevention of accidents.

That undertaking was not also assumed in any respect by the United States. The right of inspection however was reserved concerning the quality of performance, namely the extent to which the specifications were lived up to, but not the methods employed to accomplish the contractual purpose.

Therefore the terms of the contract did not impose any power of direction over, or responsibility for, the methods pursued by Project in carrying forward the very considerable work embraced in the contract and specifications.

It is next required to ascertain whether actual performance departed from, or accorded with, the foregoing statement of the court's understanding of the contractual relationship of the respondent and Project.

The libelant argues that the testimony of Anderson, the Naval Inspector employed by the respondent, and called by Lyon, is consistent with an assumption by the Government of responsibility for failing to require that Project take proper steps to provide a safeguard in the space created by the said removal of the rail.

The court does not so understand his testimony; a deceased person named Scout was also a Naval Inspector on this job, and the latter gave his attention mainly to the work on deck, while Anderson's principal task had to do with work on the engines. However, they both maintained inspections throughout the ship, top-side and below, and Anderson's testimony is thought to be sufficiently explanatory of their common task, to take the place of what Scout would have deposed, had he been available as a witness.

It was their duty to see that the requirements of the contract were lived up to, so far as the work itself was concerned, as distinguished from the way in which it was done. However, Anderson said that if he observed that work was being done in a way that was dangerous to the men doing it, there would be a duty resting upon him to report it to the Project Superintendent, Hallinan. He also made it clear that he would have done this as a matter of course; by this the court understands that if there is any magic in the word "duty" what the witness meant was obedience to a humane impulse, as distinguished from any obligation resting in the prime contract with Project.

He also said that he had reported deficiencies in performance to Hallinan; that he had known of the absence of this rail prior to June 2, 1952 (the actual period was about two weeks) and that prior to that date he had not notified Hallinan of any unsafe method being pursued in connection with this work, that is, "not to my knowledge." Also (p. 63) that he did not notify Hallinan prior to June 2, 1952 about the gap.

If he had so reported, there is nothing to indicate that Hallinan would have been required to adopt remedial measures at the instance of Anderson for such report would have been directed not to product which he could perhaps reject, but to method which Hallinan supervised.

As Anderson stated it:

"Well, it is not the duty of the inspector as to *how*, the *manner* the work is done, but how the *job* is done." (Italics supplied.)

For instance, if Anderson had observed a fire starting near a welding operation, he would have considered it necessary to cry out a warning, not because it was part of his duty as an inspector, but because it would have been an irresistible impulse—a duty of his nature, not of his employment.

It results therefore that there was no departure in practice from the terms of the contract whereby methods of performance were entirely in the control of Project.

Something should be said briefly about the extracts from the ship's logs, which have been received in evidence. There were aboard the Stewart the Master, Chief and Second Officers, and two Third Officers during the interval from May 20 to and including June 2, 1952, but probably not all at one time. The logs show that there were frequent tours of inspection by the officers throughout the vessel, deck officers patrolling, and all was found in good order.

It was agreed that the purpose of the tours of inspection was to ascertain that the work was going forward according to the specifications.

No officer was called to testify, but the court has accepted the statements of counsel, that the officers and such members of the crew as were aboard, were acting as custodians of the ship's stores, radar installations and the like, which required safeguarding, but that no member of the ship's company had any control whatever over the repairs, new installations, alterations in cabins or living quarters, engine replacements or the like; also that the asserted responsibility of the respondent toward the libelant with reference to the removal of the rail, and the failure to adopt what libelant conceives to be adequate measures to provide protection to him when he was at work at Station No. 4 on the boat deck on June 2, 1952, is in no respect related to the presence on the ship of some officers and some members of the crew, during the period the rail was not in place, including the day of the accident.

In conclusion, it should be said that the question of whether a rope was indeed rigged across the open space is of little or no importance according to the court's understanding of the decision necessarily to be reached.

I believe such a rope was rigged across the open space, but whether its presence on the day of the accident would have impeded the task in which Lyon was engaged, is so speculative that no opinion can be ventured on that subject. Probably as originally made fast, it was somewhat of a safeguard to prevent anyone from falling over-side; but during the ensuing days, it was caused to sag almost to the deck, in part by the presence of air hoses, cables carrying wires, etc.; which were passed over it, so that it was of no avail by the time Lyon started to adjust the winch base heretofore designated, on June 2, 1952. He had already done the same job at the like station on the starboard side, where the dimensions of his working platform were the same, and where the railing had already been removed. He had thus tested the working conditions and found them not to be unsafe; but whether there was a rope rigged at the starboard opening, does not appear from the testimony.

 In any case, his claim for negligence would lie against Project, but that is academic in view of the coverage under the Longshoremen's Compensation Law, 33 U.S.C.A. § 901 et seq., which has been pleaded, stated in the record, and is not controverted.

Conclusion of Law:

It results that the libel against the respondent must be dismissed for failure of proof; and that the Impleading Petition must therefore be dismissed, both without costs.

Settle decree.