Karl L. PEDERSEN, Libellant,

v.

THE Tanker BULKLUBE, her engine, tackle, appurtenances, etc., Respondent,

and

Todd Shipyards Corporation, Respondent-Impleaded.

No. 19943.

United States District Court E. D. New York.

Feb. 11, 1959.

---

Lebovici & Safir, New York City, for libellant, Herbert Lebovici, New York City, of counsel.

Giallorenzi & Cichanowicz, New York City, for respondent, Victor S. Cichanowicz, New York City, Paul M. Jones, New York City, of counsel.

Galli, Terhune, Gibbons & Mulvehill, New York City, for respondent-impleaded, Todd Shipyards Corp., Oscar A. Thompson, New York City, of counsel.

ZAVATT, District Judge.

This is a libel in rem brought by Karl L. Pedersen, who on August 8, 1952 was employed as a rigger by the respondent-impleaded, Todd Shipyards Corporation (hereinafter referred to as Todd). On that date Pedersen was injured as the result of a fall caused by the collapse of a staging erected by Todd in a tank aboard the respondent vessel, S. S. Bulklube, which was owned by the claimant, National Bulk Carriers, Inc. (hereinafter referred to as National).

The status of the Bulklube at the time of the accident was the subject of findings by the Court of Appeals and by Judge Murphy below in Berge v. National Bulk Carriers, Inc., D.C.S.D.N.Y. 1957, 148 F.Supp. 608, 609, affirmed 2 Cir., 1958, 251 F.2d 717, certiorari denied 1958, 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1066 (involving an accident aboard the S. S. Bulklube during the course of repairs under consideration in the instant case) and many of the facts as so found are, by stipulation, deemed to be existent in the instant cause. Thus, as found by Judge Murphy:

"National Bulk Carriers, the owner and operator of the tanker S. S. Bulklube, entered into a contract with Todd whereby the latter was to perform certain rather extensive repairs, including renewals of the transverse and longitudinal bulkheads, for a contract price of $981,-133. The vessel was delivered to Todd on June 22, 1952, and returned to its owner December 19, 1952."

On August 8, 1952 the Bulklube was tied up alongside a pier in Todd's shipyard. Judge Murphy, continuing:

"By the terms of the contract, the work was to be carried out 'under the supervision of and to the satisfaction of representatives of the U. S. Coast Guard, American Bureau of Shipping and Owner.' In this connection, the vessel's former chief mate was aboard every day from 8 A.M. to 5 P.M. acting as Assistant Repair Supervisor. Sleeping quarters aboard ship were available for his convenience if he chose to use them. He had not signed articles and was paid a weekly salary the same as defendant's other shoreside employees. National Bulk Carriers' Port Engineer also came aboard every day, although he had no regular hours. These men gave no orders but inspected the work as it was completed."

At the time of the accident, it is stipulated, the vessel was in the control of Todd. All National did while Todd was performing its contract was to inspect the work as various items were completed, the former chief mate assisting the Port Engineer in this regard. Again, Judge Murphy, continuing:

"The contract also called upon Todd to provide all the necessary labor and material required for the completion of the work, and it is conceded that Todd supplied the materials involved in the accident * *

"There were no provisions in the specifications pertaining to indemnification. The printed terms on

Todd's letterhead contain the following language: 'In connection with the accident and/or indemnity and/or insurance clauses, if any, contained in your specifications, relating to liability for personal injuries, please note that we do not agree to same, insofar as they undertake to impose any liability or any obligations to take out or maintain insurance beyond the liabilities or the obligations * * * imposed upon us by law.' The specifications were accepted subject to the above condition."

The parties agreed that the work which was to be done by Todd upon the vessel included removing some of the decks, burning out partitions and bulkheads which divided the vessel into twenty-three tanks, making new bulkheads and partitions, putting them in place, renewing the longitudinal and deck beams, and reconditioning her engines, boilers, steering gear and a substantial part of her machinery, and that this, as Judge Murphy observed, amounted to a virtual rebuilding of the interior of the vessel. However, the shell of the vessel, those members of the vessel corresponding to the keel, including the keelson, and the external structures of the vessel above the main deck, such as the bridge house, the bridge, and the after structures, were substantially undisturbed.

August 8, 1952, was the fourth day on which the libellant had been employed by Todd as a rigger. During the course of the night of the 8th it became necessary as part of Pedersen's duties that he climb upon a staging in the Number One tank of the Bulklube, and there hold a piece of metal for a welder who was to weld the metal to the wall of the tank so as to form the support for another staging. The staging upon which Pedersen stood was one of a number erected upon the sides of the tank and was located approximately forty to fifty feet from the bottom of the tank. It consisted of a single plank twelve feet long, twelve inches wide, and two inches thick, which rested at either end upon a metal bracket which was welded to the wall of the tank. The normal means of erecting such a staging would have been to reinforce the brackets at the ends of the plank with angle irons running from the inboard and otherwise unsupported ends of the brackets to the wall below the points at which the brackets were welded thereto. There were no angle irons to support the brackets of the staging upon which Pedersen stood. As Pedersen stood on the after end of the plank and the welder stepped upon its forward end the bracket supporting the forward end collapsed, causing the plank to descend at this end. Pedersen was thrown inward and fell to the bottom of the tank.

The parties stipulated that the staging, with all of its parts, was built by employees of Todd other than Pedersen. They agreed further that National had taken no part whatsoever in constructing the staging or any of its component parts, and had no knowledge or notice as to how the staging had been erected, or what its condition was, or that it was an unsafe place for the libellant to work.

At the time of the accident about thirty to forty per cent of the repair work under the contract had been completed. The engines of the tanker had been dismantled and were in the process of being repaired. The vessel could not steam under its own power. In fact, from the time the vessel was in the Todd shipyard, once active work was commenced on her, she was not fit to go to sea until the work was completed. On December 18, 1952 her certificate of seaworthiness was "renewed" and the Bulklube was found by the American Bureau of Shipping in all respects fit to return to sea in the carriage of cargo. The parties were unable to stipulate and the record is bare as to the status of the certificate of seaworthiness on August 8, 1952. The vessel was returned to National on December 19, 1952, and entered upon the "further performance" of a charter party which had been in effect when the vessel was delivered to Todd on June 22, 1952. The parties were unable to

stipulate whether on August 8, 1952 the charter had been suspended, or whether the rates were so regulated as to permit a prolonged period of lay-up. On December 19, 1952 the vessel sailed from New York to Texas City, Texas, to load a petroleum cargo.

On these facts it is clear that the injuries to Pedersen were caused solely by the negligence of Todd in failing to properly construct the staging upon which Pedersen was required to perform his work. Recognizing the exclusiveness of Todd's liability to secure the payment of compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 905, the libellant makes no other claim against his employer as the result of his injuries. Furthermore, giving due recognition to the decision in Berge, supra, the libellant makes no claim grounded upon the breach of an alleged warranty of seaworthiness. The cause rests, rather, upon the grounds that (1) National has been derelict in its purported duty to provide the libellant with a safe place to work, and that *a fortiori* its vessel may be held accountable in a proceeding in rem; and that (2) the vessel is liable to Pedersen as a business guest for the tort of anyone who may have been in lawful possession thereof.

There is no merit to the libellant's first claim. What is spoken of as a shipowner's non-delegable duty to provide a business visitor or invitee with a safe place to work, see Palazzolo v. Pan-Atlantic S. S. Corp., 2 Cir., 1954, 211 F. 2d 277, affirmed Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 1956, 350 U. S. 124, 76 S.Ct. 232, 100 L.Ed. 133, where not clearly identical with the shipowner's duty to provide a seaworthy vessel, see Berti v. Compagnie de Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397, is no more than a requirement that reasonable due care under the circumstances be exercised. That is, where liability has been imposed for failure to furnish a safe place to work, such liability has been grounded upon negligence, see e. g., Fodera v. Booth American Shipping

Corp., 2 Cir., 1947, 159 F.2d 795; Vanderlinden v. Lorentzen, 2 Cir., 1944, 139 F.2d 995. What was said with regard to a seaman in Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213, certiorari denied 1951, 340 U.S. 935, 71 S.Ct. 495, 95 L.Ed. 675, is relevant here as well:

"We think that the district court was right in holding that in the absence of evidence of negligence or unseaworthiness the respondent was not liable for failing to provide a safe place to work. 'If,' as Chief Judge Kirkpatrick said in his opinion, Cookingham v. United States, D.C., 87 F.Supp. 203, 205, 'the place where a seaman works is unsafe that is a fact which may establish that the ship was unseaworthy or that the employees were negligent, but' there is 'no basis for holding that there is a third and separate ground of liability in this regard.'" 184 F.2d 213, 214.

The shipowner's liability, if any, resting in negligence, control of the vessel during the progress of repair work must be regarded as a vital concomitant of such liability. Pioneer S. S. Co. v. Hill, 6 Cir., 1955, 227 F.2d 262. In the instant case National exercised no control over the methods of work employed by Todd in the performance of its contract. This being so, National cannot be held for the failure to furnish Pedersen a safe place to work. The recent case of Amato v. United States, D.C.S.D.N.Y. 1958, 167 F.Supp. 929, is distinguishable from the case at bar both as to the conspicuous and relatively long-standing nature of the hazard there involved, and as to the presence there of a skeleton crew which, Judge Bryan believed, was charged with responsibility as agents of the owner for observing and correcting an open and apparent danger. Compare Lyon v. United States, D.C.E.D.N.Y. 1958, 163 F.Supp. 206. There being no warranty of seaworthiness running to libellant his injuries must be held to be solely the result of the manner in which the work was done under Todd's super-

vision, for which there could have been no recourse in personam against National. Berti v. Compagnie de Navigation Cyprien Fabre, supra.

The court does not believe that Halecki v. United New York and New Jersey Sandy Hook Pilots Association, 2 Cir., 1958, 251 F.2d 708, certiorari granted 1958, 357 U.S. 903, 78 S.Ct. 1149, 2 L. Ed.2d 1154, impels the conclusion that National was liable for any lack of reasonable care to ascertain the methods and means by which Todd carried on its activities "during the entire period" in which it did so. There was no finding in Halecki that the vessel was out of the control of its owners during any period of the repairs there involved. The contrary is thought to be indicated by the facts set forth in the dissenting opinion of Judge Lumbard, wherein it appears that the vessel retained its crew which participated in the repairs. The duty of a shipowner to oversee the methods employed by an independent contractor, analogous to the duty referred to in the Restatement of Torts, Vol. II, § 344, Comment b., upon which the majority in Halecki relies, appears to be consistent only with the retention by the shipowner of control over the methods and manner by which the independent contractor performs its work. Compare Gallagher v. United States Lines Co., 2 Cir., 1953, 206 F.2d 177.

The cases upon which libellant relies do not sustain the second basis upon which his claim rests, to wit, that in the circumstances in which his injuries were caused the vessel is liable to him in rem for the tort of anyone in whose lawful possession it may have been. Assuming, without deciding, that on August 8, 1952 the status of the Bulklube was such that it remained the proper subject of a maritime lien, there remains the question, raised in Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, 924, of whether there can be a maritime lien without a liability in personam for which it is security. Each of the cases cited by libellant involved an injury for which the person or persons in charge of the libeled vessel was personally liable, for which the ship, which was the instrument of the wrong, was made to stand as security. In the Grillea case Judge Hand notes that the question of whether a maritime lien can be imposed upon a ship for a claim for which no jural person is liable in personam is one which "So far as we have found * * * has never come up in the books, although, as res integra, we see no reason why a person's property should never be liable unless he or someone else is liable 'in personam.'" Grillea sustained a libel in rem where the only personal liability in connection with the injury could have lain with the charterer of the vessel, which was also Grillea's employer, and therefore protected by the Longshoremen's and Harbor Workers' Compensation Act. The ratio decidendi of the Grillea decision is obscure. Judge Abruzzo in Bennett v. The Mormacteal, D.C.E.D.N.Y.1957, 160 F.Supp. 840, affirmed on opinion below 2 Cir., 1958, 254 F.2d 138, certiorari denied 1958, 358 U. S. 817, 79 S.Ct. 26, 3 L.Ed.2d 59, found one of the "dominant reasons" for holding the Grillea libel in rem sustainable to be the contract provision in Grillea whereby the charterer-employer agreed to indemnify the owner against any lien arising out of the operation of the vessel by the charterer. Judge Abruzzo did not sustain a libel in rem against a vessel owned by Bennett's employer who was protected by the Compensation Act, relying considerably upon the absence of any question of indemnity to distinguish Bennett from Grillea. Neither Judge Hand nor Judge Abruzzo explained the significance of a contract of indemnity between a "guilty" charterer and an "innocent" shipowner in establishing liability in rem in the vessel where the charterer and the owner are not otherwise personally liable. In the case at bar there were, as Judge Murphy found in Berge, no provisions in the specifications pertaining to indemnification. Although at a loss to understand the theoretical significance of this fact, I conclude, in the light of the decision in Bennett, that

Grillea does not sustain the position which libellant advances. In any event, it would be strange logic to hold that a vessel, owned by one who might be otherwise liable in tort but who is within the protection of the Compensation Act, cannot be reached in a proceeding in rem, and at the same time to hold, as libellant urges here, that a vessel owned by a wholly innocent third party can be held liable where, as here, there is no contract of indemnity, and the negligence causing the injury is solely attributable to the employer protected by the Compensation Act.

■ There is further reason why the libellant's position cannot be sustained. Assuming, arguendo, that this ship, in the process of being rebuilt, was the proper subject of a maritime lien, and assuming, again arguendo, that an action in rem is maintainable against the vessel albeit no jural person is liable in personam for libellant's injuries, there remains the question of whether a vessel can be held liable under the circumstances of the instant case. The Court finds as a fact that the Bulklube was withdrawn from navigation. Each of the cases upon which the libellant relies, e. g., The Barnstable, 1901, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954; The John G. Stevens, 1898, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969; The China, 1869, 7 Wall. 53, 19 L.Ed. 67, is concerned with the consequences flowing from the negligent operation of a vessel in navigation as an instrument of commerce. None goes so far as to hold a vessel liable for injuries received by a workman engaged in work involving a virtual rebuilding of the whole interior of a vessel which has been temporarily withdrawn from navigation. In the absence of authority to do so, this court is not disposed to so hold. Cases such as The Owyhee, D.C.E.D.N.Y.1932, 60 F. 2d 641, affirmed 2 Cir., 1933, 66 F.2d 399, cited by the libellant, to the effect that there may be a lien for the unpaid balance of the agreed price of repairs upon a vessel which is being "rebuilt" are not authority for the proposition that a vessel itself is liable to a contractor's employee who is injured through the negligence of his fellow employees in the course of such rebuilding.

The foregoing shall constitute the court's findings of fact and conclusions of law. The libel and petition impleading Todd Shipyards Corporation are dismissed, without prejudice to the petition being raised again should the need arise. The parties will settle an appropriate decree and will submit such proposed additional findings of fact and conclusions of law as are deemed by them to be necessary.