Louise J. O'LEARY, James Michael O'Leary, Robert Louis O'Leary, and Richard Douglas O'Leary, Minors, by their Guardian ad Litem Louise J. O'Leary, Plaintiffs,

v.

JAMES & WUNDERLICH, a joint adventure, Guy H. James Construction Company, a corporation, and Wunderlich Contracting Company, a corporation, Defendants.

Louise J. O'LEARY, Executrix of the Estate of Michael D. O'Leary, Deceased, Plaintiff,

v.

JAMES & WUNDERLICH, a joint adventure, Guy H. James Construction Company, a corporation, and Wunderlich Contracting Company, a corporation, Defendants.

Civ. Nos. 2006, 2007.

United States District Court
D. Montana,
Havre-Glasgow Division.

Jan. 22, 1960.

Franklin S. Longan, Calvin A. Calton and Franklin A. Lamb, Billings, Mont., for plaintiffs.

Hoffman & Cure, Great Falls, Mont., for defendants.

JAMESON, District Judge.

The defendants Guy H. James Construction Company and Wunderlich Contracting Company have moved the court, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., for judgment in accordance with their motion for a directed verdict at the close of all the evidence. The case was tried before a jury, but no verdict was returned. Counsel for the respective parties have filed briefs, and oral argument was presented to the court on December 9, 1959.

Cause No. 2006 is prosecuted by Louise J. O'Leary, as widow and guardian of the minor children of Michael D. O'Leary, deceased, and Cause No. 2007 is prosecuted by Louise J. O'Leary as the executrix of his estate. Both actions were instituted against James & Wunderlich, a joint adventure, Guy H. James Construction Company, and Wunderlich Contracting Company. At the close of plaintiffs' case a motion to dismiss as to James & Wunderlich, a joint adventure, was granted, for the reason that James &

Wunderlich had been dissolved and the assets distributed to the other defendants prior to the institution of these actions.

It is alleged in both complaints that Michael D. O'Leary died on December 3, 1955, as the result of the inhalation and absorption of noxious fumes of a poisonous character from vinyl resin paint containing benzene and benzol derivatives furnished by the defendants to Michael D. O'Leary for use in spray painting the steel structured portion of a dam under construction by the defendants. It is alleged further that the paint was sprayed and applied under the direction and control of the defendants; that the defendants knew or, in the exercise of ordinary care, should have known that the paint was dangerous and deadly to human beings when sprayed and applied in the manner directed; that the areas in which O'Leary was directed to spray the paint by the defendants were narrow and confined spaces with inadequate ventilation; that O'Leary wore protective clothing and protective masks which defendants furnished to him for safety reasons; that defendants knew or, in the exercise of ordinary care, should have known that the protective masks and clothing so furnished were inadequate; and that the defendants were "negligent in furnishing the said paint and protective clothing and masks" in the place and manner and under the conditions alleged in the complaints. Defendants deny all allegations of negligence and deny that O'Leary died as the result of the inhalation and absorption of any noxious fumes of a poisonous character from paint furnished to O'Leary by defendants. They allege as a separate defense that O'Leary was guilty of contributory negligence and assumed the risks incident to the painting in question.

James & Wunderlich was the general contractor for the construction of Tiber Dam, pursuant to a written contract with the United States, through the Bureau of Reclamation. James & Wunderlich entered into a subcontract with Hakes Erection Company for the installation of the radial gates on the spillway.

In turn, Hakes Erection Company entered into a written contract with Michael D. O'Leary for the painting of the gates.

It is agreed that Hakes was an independent contractor. The complaints allege that O'Leary was an employee of Hakes. This was admitted by the defendants in their answer, although they also allege as separate defenses (1) that O'Leary was an independent contractor of Hakes Erection Company pursuant to a written contract and that defendants had no supervision or control over O'Leary's work except as to the final results; and (2) that if O'Leary were not an independent contractor, he was an employee of Hakes and in the position of a statutory employee of the defendants, and that these actions accordingly are barred under the Workmen's Compensation Act of Montana, R.C.M.1947, § 92–101 et seq. For a portion of the time O'Leary was performing the painting work he was carried on the payroll of Hakes Erection Company, and for a portion of the time on the payroll of James & Wunderlich, as an accommodation to Hakes Erection Company. O'Leary was found by the Industrial Accident Board of the State of Montana to be an employee of Hakes Erection Company at the time of the alleged injury, and an award was made to his widow and family as the result of his death.

While plaintiffs allege that "all work which he (O'Leary) performed was under the direct control and supervision of the said James & Wunderlich", the evidence failed to establish this allegation. If the work had been performed under the direct control and supervision of the defendants, it would be necessary to consider defendants' contention that O'Leary was a statutory employee of the defendants. Plaintiffs do not contend in their brief on this motion that the defendants exercised control or supervision over O'Leary's work, but rather that "proof shows negligent failure to exercise any supervision or control."

Plaintiffs' contentions are set forth concisely in their brief as follows:

1. Where a prime contractor in control of premises lets out work to a subcontractor, the subcontractor's employee is an "invited person" or "business guest", and the prime contractor is liable for any lack of reasonable care to ascertain the methods and manner in which the concessionaire or independent contractor carries on his activities, not only at the time that concession is let or the contractor is employed, but also during the entire period in which concessionaire or contractor carries on his activities.

2. Where a prime contractor assumes by contract the duty toward third parties with respect to dangerous or hazardous work, the prime contractor is bound by that standard of care and cannot delegate that duty to independent contractors and is liable to third parties for injuries caused by the failure of the prime contractor to observe that duty.

A determination of defendants' motion will depend largely upon the relationship of O'Leary to the defendants and Hakes Erection Company, and the respective duties and obligations of the parties under that relationship.

The prime contract between the Bureau of Reclamation and James & Wunderlich provides in part:

"Article 1. The contractor shall * * * perform the work for construction and completion of Tiber Dam * * * in strict accordance with the specifications, schedules, drawings, all of which are made a part hereof and designated as follows: Specifications No. 3128. * * *."

"Article 8. Superintendence by contractor.—The contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the contracting officer, on the work at all times during progress, with authority to act for him."

Paragraph 13, of Specifications No. 3128 provides as follows:

"13. *Accident prevention.* The contractor shall, at all times, exercise reasonable precautions for the safety of employees in the performance of this contract, and shall comply with all applicable provisions of Federal, State, and municipal safety laws and building and construction codes. The contractor shall also comply with the provisions of the Safety Handbook of the Bureau of Reclamation (Volume XII of the Bureau Manual) as approved by the Commissioner and in effect on the date of award of contract, so far as applicable, as determined by the contracting officer and unless such instructions are incompatible with Federal, State, or municipal laws or regulations. Monthly reports of all lost-time accidents shall be promptly submitted giving such data as may be prescribed by the contracting officer. Nothing in this paragraph shall be construed to permit the enforcement of any laws, codes, or regulations herein specified by any except the contracting officer."

The Bureau of Reclamation's Safety Handbook, Part II, Personal Safety, Chapter 2.1, Protective Devices, paragraph .3 provides: "The use of personal protective equipment on Bureau operations as an aid in the prevention of occupational injuries is an important requirement. In the choice of such equipment, the factors to be considered are the comfort of the users, degree of protection afforded, availability of the equipment and cost. Personal protective equipment consisting of goggles, face shields, hard hats, respirators, sand-blasting hoods, dust masks, gas masks, safety belts, and life preserver vests, where its use is indicated by the requirements of this hand book, shall be provided by the Bureau, maintained, and its use enforced. On contract work, the contractor shall likewise furnish, maintain, and enforce the use of the above personal protective devices as occasioned by the type of work being performed."

The Handbook contains the following provision with regard to spray painting: "B. Spray-painting operations should

be so confined as not to contaminate the air where other men are working. Spray gun operators should be required to wear clothing which fits snugly at the ankles, neck and wrists, and shall wear gloves, goggles, and respirators." [1]

The sub-contract between James & Wunderlich and Hakes Erection Compa-

1. Other provisions of the Safety Handbook upon which plaintiffs rely include: "Respiratory Equipment. D. There are several procedures for controlling exposure to hazardous atmospheres. They include substitution of less toxic material, enclosure of processes, wet methods, local exhaust, general ventilation, and use of respiratory protective devices. Respiratory devices usually are employed to supplement other methods of control or they may be used when other methods are not readily applicable or practicable. Two basic principles have been utilized in the development of respirators: purification of the inhaled air by removal of the contaminant (air-purifying respirators), and supplying a respirable atmosphere to the wearer from an uncontaminated source (air-supplying respirators). All respirators, dust masks, gas masks, and other respiratory protective devices shall be of types as approved by the United States Bureau of Mines for the hazard for which protection is required.

"Chemical Cartridge Respirator (1) Low concentrations of toxic gases and vapor are atmospheres which can be breathed without protection but which will produce discomfort and possible injury after repeated exposure to them. While gas masks, hose masks, and oxygen breathing apparatus would give adequate protection against such concentrations, these devices are seldom used because of the existence of more practical devices. For protection against low concentrations of toxic gases and vapors, an air-supplying respirator or chemical-cartridge respirator is prescribed.

"Gas Masks. (2) Moderately high concentrations of toxic gases and vapors are those not exceeding approximately 2 percent; but nevertheless immediately dangerous to life. The most probable choice for protection in this case would be a gas mask, because of its light weight, absence of restriction of movement, ease of maintenance, and small amount of training required by the wearer. The appropriate canister for the classes of contaminants likely to be present must be selected.

"Hose Masks. (3) Very high concentrations of toxic gases and vapors are those exceeding 2 or 3 percent. Either oxygen breathing apparatus or hose masks with blowers are the logical choice, depending upon local conditions."

"Protection from Dust and Fumes. 3. Aside from its explosiveness, air laden with dust or fumes may cause suffocation or other respiratory injury, and may also have toxic effects through the skin or alimentary system. In painting, the dust comes chiefly from operations preparatory to painting, such as sandblasting, scaling, scraping, and brushing. Injurious fumes are given off when volatile paint materials are being mixed or applied, especially when they are sprayed. Dust and fume nuisance is most dangerous in constricted spaces. Coal-tar paint fumes are particularly noxious.

"A. Workmen must be provided with an ample supply of fresh air. If natural circulation is not adequate, artificial ventilation shall be provided. Ventilation shall be sufficient to carry away harmful accumulations of dust and fumes, or workmen shall wear approved-type respirators. It should be remembered that mechanical filter-type respirators afford no protection against noxious vapors or gases, and that neither the mechanical nor canister types will protect against a deficiency of oxygen. All types of respirators need systematic cleaning and maintenance. They should be handled carefully and stored in tight, clean cases.

"Handling Paint Materials. 4. Serious harm may result if the skin is exposed to prolonged contact with paint materials. Injury may take the form of burns or of toxic effects resulting from absorption into or through the skin. It is well to avoid the use of paint solvents for cleansing the skin. These materials are not only injurious themselves, but they also carry poisonous ingredients of the paint into the pores of the skin. There are a number of protective creams which may be applied to the skin before exposure to paint substances, and which wash off easily in warm soapsuds, taking paint off with them. The use of protective creams by all painters is recommended.

"Physical Examinations. 6. Painters should have periodic physical examinations to indicate whether or not the work is impairing their health. (See Chapter 2.1.)"

ny for the installation of the radial gates provides in part:

"2. Sub Contractor shall perform all of the above work and furnish, in strict accordance with the above contract, plans, specifications, schedules, drawings, and addenda, all of which are hereby referred to and made a part of this contract all materials required thereby except those furnished by the government or by the Contractor as hereafter provided. It is the intent hereof that the Sub Contractor shall assume, take over, and be bound by all the obligations of the Contractor to the U. S. Bureau of Reclamation, under the terms of the original contract, including the provisions in the contract concerning labor and renegotiation which is attached hereto as Exhibit 'A'."

"8. Sub Contractor, in the performance of the terms of this agreement shall be subject to no supervision or control by Contractor, except as to ultimate completion of the items of work prescribed herein, in compliance with the terms of this agreement and the prime contract, plans, specifications, addenda and changes by the U. S. Bureau of Reclamation, if any; it being the intent hereof that Sub Contractor, shall at all times, be an independent contractor and not an employee of Contractor."

Hakes Erection Company in turn entered into a sub-contract with Mike O'Leary which reads as follows:

"Sub-Contract Radial Gates. This Agreement is between Hakes Erection Co. and Mike O'Leary painting contractor. Work to be performed under this agreement by Mike O'Leary for the Hakes Erection Co. consists of the following. Sandblasting and painting radial gates, gate hoists, stop log guides, and feir nose plates, for the sum of $3,700.00. All material to be furnished by Hakes Erection Co., Hakes Erection Co. will furnish sand blasting machine and sand. Men working for Mike O'Leary will be carried on the Hakes Erection Co. payroll, this amount in addition to Workmen's Compensation, Social Security and payroll tax shall be deducted from the agreed price of the contract. All work to be performed according to Bureau of Reclamation plans and specifications # 3128—Tiber Dam. Payment to Mike O'Leary to be made immediately upon receipt of payment from general contractor.

"Mike O'Leary
"Mike O'Leary—Contractor

Vern L. Hakes
Hakes Erection Co.
"Vern L. Hakes—President."

———————◆———————

The written contract between Hakes Erection Co. and O'Leary was received in evidence, without objection, as a part of plaintiffs' case. The relationship of the various parties was set forth and illustrated by counsel for plaintiffs in his opening statement by reference to the respective contracts. Referring to James & Wunderlich, counsel said in part:

"That is the defendants that we have sued here, the contractor who built the dam, subcontracted the steel work on the gates, the erection work, the iron work to erect them to Hakes Erection Company, and he in turn the painting of the gates to Acme Painting Company, and that company the evidence will show was owned entirely by Michael D. O'Leary * * *"

Louise J. O'Leary testified that O'Leary was the sole owner of Acme Painting Company at the time of the acts complained of, and that he "had a truck,

\* \* \* compressor, hoses, sprayers and ladders." He used this equipment on the Tiber Dam project.

There was no representative of Hakes Erection Co. on the project during the painting work in question. There was no evidence that either Hakes Erection Co. or defendants exercised any direction or control over the method or manner of performance of O'Leary's work. The two other painters on the job were hired by O'Leary.

■ Nor does the contract between Hakes Erection Co. and O'Leary give Hakes the power to control the method and manner of performance of the work. Rather it provides that all of the work shall be performed "according to the Bureau of Reclamation plans and specifications #3128—Tiber Dam." The contract provides for a lump sum payment for the entire job. "An express contract to pay by the job is always strong evidence that the relation of master and servant does not exist." Shope v. City of Billings, 1929, 85 Mont. 302, 278 P. 826, 827.

The provisions of the contract and testimony regarding the conduct of the work indicate an independent contractor relationship. It is true O'Leary was carried on the payrolls of Hakes Erection Co. for a part of the period and James & Wunderlich for a part, and that he was found by the Industrial Accident Board of Montana to be an employee of Hakes Erection Co. within the meaning of the Montana Workmen's Compensation Act. It is likewise true that defendants' answer admitted that O'Leary was an employee of Hakes, although as set forth above, it was alleged as a separate defense that O'Leary was an independent contractor. It appears from the pleadings and pre-trial procedures that the theories of both parties depended to some extent on what might be disclosed by the evidence.

Whether O'Leary be designated an independent contractor or employee of Hakes, the obligations of the parties must be determined from the written contracts and manner and method of performance of the work pursuant thereto. Before discussing the authorities upon which plaintiffs rely to support their contention that a jury issue is presented, it seems advisable to elaborate further on the evidence which might bear upon the obligations of the respective parties.

Plaintiffs rely in part upon the testimony of Francis Bleecker, superintendent for James & Wunderlich on the Tiber Dam project, to show the responsibility and duty of the defendants. In substance, Bleecker testified that the manner in which the paint work was performed "was left up to the Bureau of Reclamation Inspectors"; that if it were not done right, it would be passed from the Bureau to James & Wunderlich, and from James & Wunderlich to Hakes. With particular reference to the safety regulations, Bleecker testified in part:

"Q. So if a dangerous condition existed and it was reported by the Bureau through the chain of command to you and then back down to the contractor where the dangerous condition existed, whose immediate responsibility would it be to correct that dangerous or hazardous condition? A. Of course a hazardous condition—

"Q. Just answer my question. Whose responsibility would it be? A. Well, there is a lot of responsibility.

"Q. Well, whose immediate responsibility? A. The first man to know would be the inspector.

"Q. But which contractor had the immediate responsibility? A. The immediate responsibility would be the subcontractor, of course.

"Q. And who had the ultimate responsibility? Isn't that James and Wunderlich? A. That is right.

"Q. And your answer of course would be the same with regards to any safety regulation I quoted to you wouldn't it? A. I think so."

There was an inspector of the Bureau of Reclamation on the job at all times. One of them (Bentz) testified that when

O'Leary came on the job in the fall of 1954 he "interpreted the specifications" for O'Leary, "with reference to cleaning up, sand blasting, and what paint goes where and safety regulations"; and that he showed O'Leary where to find the safety regulations. He testified further that if he found any violation of safety regulations he would report to the field office, which in turn would report to the construction engineer, and when the reported violation reached the top, it would be sent to the contractor, James & Wunderlich. There was no evidence that any violations by Hakes or O'Leary were reported to James & Wunderlich by the Bureau of Reclamation or anyone else.

The defendants furnished the vinyl resin paint used by O'Leary in painting the radial gates. The paint was tested by the Bureau of Reclamation prior to its use and was found to meet the Bureau's specifications. There was no evidence, however, that the Bureau tests included tests for safety. Vinyl resin paint made by the same manufacturer had been used on other Bureau jobs.

 There is a conflict in the evidence as to whether the paint contained benzene or benzol derivatives of a poisonous character. While the court might feel that the evidence on this point preponderates in favor of the defendants, this was a question of fact for the jury. In a consideration of defendants' present motion, the court must view the evidence in the light most favorable to the plaintiffs. There was likewise a conflict in the evidence with respect to the cause of O'Leary's death, but there was evidence from which a jury might find that he died of aplastic anemia as the result of benzene poisoning.

 There was no evidence, however, that defendants, the Bureau of Reclamation inspectors, Hakes Erection Company, or O'Leary had any actual knowledge that the paint contained benzene or benzol derivatives or was otherwise of a

poisonous character. Had specific inquiry been made of the manufacturer by any of them, it may reasonably be inferred that they would have been advised that the paint did not contain benzene and was not of a poisonous character in view of the positive testimony of the chemist who supervised the manufacture of the paint.

While it is alleged in the complaints (par. XI) that O'Leary wore protective clothing and masks furnished by defendants which were inadequate, there is no evidence that the defendants furnished any clothing or that O'Leary wore any mask while doing the work in question. There is evidence that O'Leary signed a receipt for two respirators in the name of Hakes. It is admitted that for a short period defendants furnished an air compressor used in sandblasting. Apparently O'Leary supplied his own clothing and the balance of the equipment.

Both Bureau inspectors testified that O'Leary had plastic hoods with an air hose and two types of respirators. One of the inspectors saw O'Leary wear a hood while sandblasting. There is no evidence that he wore a hood or respirator while spray painting outside. While there was evidence of warnings by the Bureau inspectors, it is questionable whether the warnings related to any outside painting.

The foregoing is, I believe, a fair résumé of the pertinent testimony bearing upon the relationship of the parties and which might affect their respective obligations under the decided cases and particularly those relied upon by plaintiffs.

 Whatever O'Leary's status, whether independent contractor or employee, he was an invitee or business visitor to whom under the Montana law the defendants, as occupiers of the premises, owed a duty to use ordinary care to have the premises reasonably safe or to warn of any hidden or lurking danger.[2] There

2. This rule was well summarized by the Montana Supreme Court in Cassady v. City of Billings, 1959, 135 Mont. 390,

340 P.2d 509, 510: "It is well-established in Montana that a landowner is obligated toward an invitee to either use

is no contention that the defendants furnished an unsafe place to work or that there were hidden or lurking dangers in the premises. The negligence claimed is the failure of the defendants to ascertain that the independent contractor Hakes was performing inherently dangerous work in an improper manner.

In support of their contention that the defendants were negligent in failing to exercise reasonable care to ascertain the methods and manner in which Hakes, the independent contractor, carried on its work, plaintiffs rely primarily upon Halecki v. United New York & New Jersey Sandy Hook Pilots Ass'n, 2 Cir., 1958, 251 F.2d 708, reversed on other grounds, 358 U.S. 613, 79 S.Ct. 517, 518, 3 L.Ed. 2d 541. A careful analysis of that case and its application to the facts here presented accordingly is important. Defendant was the owner of a vessel which was being overhauled in the shipyard of Rodermond Industries, Inc. One of the jobs was dismantling and overhauling the ship's generators "requiring, among other things, that they be sprayed with carbon tetrachloride."[3] This job was subcontracted to Halecki's employer. All parties were aware of the necessity of taking special precautions on this job. Ventilation equipment furnished by Rodermond was used, together with the engine room's regular ventilating equipment. A biochemist gave as his opinion that the "ventilating system in the engine-room, even when supplemented by the apparatus brought on board and installed by Doidge (sub-contractor's foreman) and the deceased was not 'adequate to remove the fumes'."[4]

In affirming a jury verdict for the plaintiff the circuit court said in part:

"As we have said the case was left to the jury in a double aspect: (1) whether the defendants had been negligent in furnishing the deceased as a 'business guest' with an unfit place to work * * *. As to the claim based on negligence, so far as the defendants mean to argue that the engine-room, equipped as it was, was a reasonably safe place in which to work, we hold that the evidence created an issue that could be decided only by a verdict. The deceased was certainly an 'invited person' or 'business guest,' and the ship-owner was liable, not only for the negligence of the master, but, although the work was let out to a subcontractor, also for any lack of 'reasonable care to ascertain the methods and manner in which the concessionaire or independent contractor carries on his activities, not only at the time when the concession is let, or the contractor employed, but also during the entire period in which the concessionaire or contractor carries on his activities.' (Citing Restatement Torts, Vol. II, § 344, Comment b). Being charged with knowledge that so dangerous a substance as tetrachloride might be used, it was proper to leave to the jury whether the 'methods and manner' of its use were proper. * *" 251 F.2d at pages 710–711.

The Supreme Court in affirming the decision of the circuit court on the negligence count said: " * * * The defend-

---

ordinary care to have the premises reasonably safe, or to warn the invitee 'of any hidden or lurking danger therein.' Milasevich v. Fox Western Montana Theatre Corp., 118 Mont. 265, 270, 165 P. 2d 195, 197, and see Restatement, Torts, Negligence, § 343. He is not an insurer against all accidents and injuries to such persons while there. Milasevich v. Fox Western Montana Theatre Corp., supra."

**3.** From Supreme Court opinion, 358 U.S. 615–616, 79 S.Ct. 518. In a footnote the Court said: "Carbon tetrachloride,

a somewhat volatile compound five times heavier than air, is toxic to humans if present in the atmosphere in concentrations of more than 100 parts to 1,000,000. It therefore is essential when working with this chemical to provide adequate ventilation, a task that is complicated because the density of the compound may result in a high concentration of the fumes in the lower portions of an enclosed area."

**4.** From Circuit Court opinion, 251 F.2d at page 710.

ants owed a duty of exercising reasonable care for the safety of the decedent. They were charged with knowledge that carbon tetrachloride was to be used in the confined spaces of the engine room. It was for the triers of fact to determine whether the defendants were responsibly negligent in permitting or authorizing the method or manner of its use." 358 U.S. at pages 618, 619, 79 S.Ct. at page 520.

The Halecki case was construed by the Supreme Court in the recent case of West v. United States, 361 U.S. 118, 80 S.Ct. 189, 191, 4 L.Ed.2d 161, "involving the liability of a shipowner for injuries suffered by an employee of an independent contractor while working inside the main engine of a vessel as it was undergoing a complete overhaul at the contractor's repair docks * * *." [5] The District Court denied recovery, 143 F. Supp. 473, and the Court of Appeals affirmed, 246 F.2d 443. With reference to the Halecki case, the Supreme Court said: "* * * Nor was United [New York and New Jersey Sandy Hook] Pilots Ass'n v. Halecki, 1959, 358 U.S. 613 [79 S.Ct. 517, 3 L.Ed.2d 541] a similar situation. In that case the shipowner directed the use of carbon tetrachloride in the confined spaces of the engine room. The resulting fumes fatally injured the shore-based workman, necessitating a remand on the negligence question. But here the owner had no control of the ship; it had been turned over to a re-

pair contractor for extensive overhaul, which was not performed under the direction of the shipowner. While there might be instances of hidden or inherent defects, sometimes called 'latent,' that would make the owner guilty of negligence, even though he had no control of the repairs, we hold that under the circumstances here the shipowner could not be so chargeable."

The Halecki case was also analyzed and construed in Pedersen v. The Bulklube, D.C.E.D.N.Y.1959, 170 F.Supp. 462, 466, where Judge Zavatt said in part:

"The court does not believe that Halecki v. United New York and New Jersey Sandy Hook Pilots Association, * * * impels the conclusion that National was liable for any lack of reasonable care to ascertain the methods and means by which Todd carried on its activities 'during the entire period' in which it did so. There was no finding in Halecki that the vessel was out of the control of its owners during any period of the repairs there involved. The contrary is thought to be indicated by the facts set forth in the dissenting opinion of Judge Lumbard, wherein it appears that the vessel retained its crew which participated in the repairs. The duty of a shipowner to oversee the methods employed by an independent contractor, analogous to the duty referred to in the Restatement of

---

5. The petitioner, a shore-based employee of the contractor, was working inside the low pressure cylinder of the main engine of the ship. An end plug from a one-inch pipe in the water system was propelled through the top of the open cylinder and hit his knee. The findings indicated that the plug was loosely fitted on an overhead water pipe and that when another employee of the contractor turned on the water without warning, the plug was forced off, hitting petitioner. The petitioner contended that the duty to furnish a safe place to work was non-delegable, the violation of which did not depend upon fault, and also that respondent's failure to keep the water plug tight was negligence. In affirming the judgment for the defendant the court

said in part: "* * * Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. But we do not believe that such a duty was owed under the circumstances of this case. Petitioner overlooks that here the respondent had no control over the vessels or power either to supervise or to control the repair work on which petitioner was engaged. * * * It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. * * *"

Torts, Vol. II, § 344, Comment b., upon which the majority in Halecki relies, appears to be consistent only with the retention by the shipowner of control over the methods and manner by which the independent contractor performs its work.[6] Compare Gallagher v. United States Lines Co., 2 Cir., 1953, 206 F.2d 177."[7]

The Halecki case was also quoted with approval in Aldridge v. States Marine Corporation of Delaware, 9 Cir., 1959, 265 F.2d 554, an action by the widow of a longshoreman against the steamship owner to recover for the death of her husband, who was employed by a stevedoring company aboard the defendant's vessel. The court held that a complaint alleging that the ship's officers, although specifically requested, failed to furnish proper tools to break metal bands around dunnage used in wedging and stowage of cargo and that as a result of having to use the only means available deceased was fatally injured, was sufficient to state a cause of action. The court suggested that the facts alleged in plaintiff's complaint had "certain sharp resemblances" to the facts in the Halecki case. The court said in part:

"In each case, in Halecki and in this one, it could be said, in view of the risky procedures adopted by the subcontractor or the stevedoring company, as the Supreme Court did in the Halecki case: 'It was for the triers of fact to determine whether the defendants were responsibly negligent in permitting or authorizing

---

6. Restatement of Torts, § 344 reads: "A possessor of land who holds it open to the entry of the public for his business purposes is subject to liability to members of the public entering for such purposes for bodily harm caused to them by his failure to exercise a reasonably careful supervision of the appliances or methods of an independent contractor or concessionaire whom he has employed or permitted to carry on upon the land an activity which is directly or indirectly connected with his business use thereof." It is recited in Comment (a) that, "A possessor of land is subject to liability, under the rules stated in this section, only towards those who come upon the land as his patrons, that is, who are invited or permitted to come thereon for the purposes for which it is held open to the public." For the distinction between the two classes of business visitors see Restatement, § 332, Comment (a). Judge Zavatt suggests, and I think properly, that the analogy to the situation covered by § 344 in the Halecki case is consistent only with retention of control over the methods and manner by which the independent contractor there performed his work.

7. In Gallagher v. United States Lines Co., an opinion by Judge Augustus N. Hand, the author of the opinion in the Halecki case, reads in part: * * * "Where power is reserved by one who has hired an independent contractor to direct or control the contractor, an affirmative duty arises to exercise that power with reasonable care. Restatement, Torts § 414. The duty is necessarily co-extensive with the power. Thus, a general ability to control the work in order to insure that it is satisfactorily completed in accordance with the requirements of the contract does not of itself make the hirer of an independent contractor liable for harm resulting from negligence in conducting the details of the work * *. The hirer 'must have the power to control the manner of performing the very work in which the carelessness occurred.' Vogel v. Mayor of City of New York, 92 N.Y. 10, 18, 44 Am.Rep. 349. Viewed in perhaps another way, United owed a duty to Gallagher, a business visitor, but this duty did not extend to conditions and activities over which United had no control. (Citing cases). " * * * We do not think that by giving United a general power to approve the equipment to be used the intent of the parties to this contract was to reserve to United the detailed control that would make it liable for the injury to the plaintiff's decedent. United never exercised any control over the details of the work, which is some indication of what the parties to the contract intended. See Hammond v. C. I. T. Financial Corp., 2 Cir., 203 F.2d 705, 707. Moreover, when the clause in question is read in conjunction with the rest of the contract it is clear that the power of approval over the equipment was only reserved to insure that Hogan complied with its contract to do the stevedoring work on United's vessels, rather than to regulate the details of the work." * * * [206 F.2d 179]

the method or manner of (their) use.'

* * * * * *

"* * * Had the facts here been developed through a pretrial conference, or on trial, the degree of knowledge which the ship's officers had, after they refused further to furnish the carpenter and his hammers, that a less safe method was in use, would have been made apparent for evaluation by the judge and jury."

* * * 265 F.2d at pages 556–557.

In my opinion the holding in the Halecki case may not properly be extended to the facts in this case. As the Supreme Court said in the West case, the shipowner in Halecki had "directed the use of carbon tetrachloride in the confined spaces of the engine room," and as Judge Zavatt said in Pedersen v. The Bulklube, supra, the holding in Halecki was based upon the fact that the shipowner had retained control over the method and manner by which the independent contractor performed its work. The opinions of both the Court of Appeals and Supreme Court in Halecki refer to the owner's "knowledge" of the use of carbon tetrachloride in a confined area, and it was held to be a jury question as to whether the owner had furnished a safe place to work.

Here there was no knowledge on the part of any of the interested parties that the paint contained benzene or was otherwise poisonous, if in fact it was poisonous. Moreover, there is a difference between knowingly using carbon tetrachloride in a small engine room and spray painting the outside of radial gates of a dam.[8] Assuming, however, that it may be found that defendants were charged with knowledge that all spray painting is dangerous, then O'Leary, under his written contract, was charged with the same knowledge. In the contract between the defendants and Hakes, Hakes had control over the method and manner of work. In turn, O'Leary had such control in his performance of the work under his contract. O'Leary had agreed to perform, according to specifications prepared by the Bureau of Reclamation, the very work from which the alleged injury arose.

■ Those cases in which the prime contractor has been held liable to an employee of an independent contractor who comes upon the premises to perform the work which results in his injury are cases where the prime contractor either (1) retains direction and control over the method and manner of work;[9] or (2) fails to provide a reasonably safe place to work or to warn of any hidden or lurking danger therein[10]; or (3) is responsible for the dangerous condition, such as furnishing defective equip-

---

8. While all of the painting in question was done in the open air, there was a conflict in the testimony as to the amount of ventilation. Three radial gates control the flow of water through the dam spillway. They are 20 feet high and 32 feet long, with abutments 40 feet high. They are located near the upstream end of the spillway and may be raised and lowered. There was a conflict as to whether the gates were completely lowered while O'Leary was painting and as to whether there was any wind blowing. The ventilation would have been affected by these factors.

9. This rule was well stated in the negative by Mr. Justice Brennan while a member of the Superior Court of New Jersey, in Trecartin v. Mahony-Troast Const. Co., 1952, 18 N.J.Super. 380, 87 A.2d 349, 351, as follows: "A general contractor who sublets work, relinquish-

ing the right of control and direction over the manner in which the work shall be done, and of the employee engaged in doing it, and exercising only such general superintendence as is necessary to see that the subcontractor performs the contract, ordinarily has no duty to protect an employee of the subcontractor from the very hazards that arise from the doing of the contract work itself; the subcontractor and not the general contractor has the duty to guard his employees against such dangers."

See also Broecker v. Armstrong Cork Co., 1942, 128 N.J.L. 3, 24 A.2d 194; Brown v. Texas Co., 1953, 237 N.C. 738, 76 S.E.2d 45.

10. Revels v. Southern California Edison Co., 1952, 113 Cal.App.2d 673, 248 P.2d 986; Continental Paper Bag Co. v. Bosworth, Tex.Com.App.1925, 276 S.W. 170; Farrell v. Diamond Alkali Co., 1951, 16

ment [11]; or fails to co-ordinate adequately the work of independent sub-contractors.[12]

We come now to the question of whether James & Wunderlich had a non-delegable duty to O'Leary under its contract with the United States and failed to observe that duty. Plaintiffs rely primarily upon the case of Ulmen v. Schwieger, 1932, 92 Mont. 331, 12 P.2d 856, 860, where the plaintiff was injured when the car in which he was riding was driven into an open excavation in a highway under construction. The defendant Schwieger was the prime contractor for the construction of the highway, and his contract charged him with the maintenance of detours and warning signals. Employees of an independent contractor had failed to erect the required barricades. The court held that the work contracted for necessarily constituted an obstruction in the highway of such a nature as to render it inherently dangerous for public travel unless properly guarded, and that the prime contractor had a non-delegable duty to the traveling public to maintain detours, signs and warnings. The court recognized that, "There is an obvious difference between committing work to a contractor to be executed, from which, if properly done, no injurious consequences can arise, and handing over the work to be done from which mischievous consequences will arise unless precautionary measures are adopted." In affirming the judgment against the prime contractor, the court said in part:

" * * * It is the owner, occupier, or person in charge of premises who is in duty bound to keep the premises in a reasonably safe condition, so that those whom he has invited to enter upon them shall not be unreasonably exposed to danger, and one charged with this duty, who fails to prevent entry by means of proper barricades or warning signs, impliedly invites those who otherwise might lawfully enter, to come upon the dangerous premises. If, through his negligence to perform this duty, persons enter and are injured, he, and not his servant or an independent contractor who owed no such duty to the public, is liable for damages suffered by reason of his negligence." (Citing cases.) 12 P.2d 863.

Does the non-delegable duty of a contractor to the public extend to one who by written contract has agreed to perform according to specifications the very work from which the alleged injury arose? It does not appear to me that the rule of Ulmen v. Schwieger may be so extended, even if we assume that the work which O'Leary was performing was inherently dangerous.[13] O'Leary himself was responsible for the method and manner of work. He agreed to perform according to the specifications upon which plaintiffs must rely. The inspector of the Bureau of Reclamation conferred with him regarding the specifications and safety regulations. Hakes Erection Company was not even present on the job and exercised no supervision or control. If we assume, arguendo, that the painting work was performed in a negligent and

N.J.Super. 163, 83 A.2d 900. Cf. Humble Oil & Refining Co. v. Bell, Tex.Civ. App.1943, 180 S.W.2d 970.

11. Continental Paper Bag Co. v. Bosworth, supra, note 10.

12. Bergquist v. Penterman, 1957, 46 N.J. Super. 74, 134 A.2d 20.

13. While it is assumed for the purpose of this opinion that spray painting is inherently dangerous, this assumption may be questioned. In support of their contention that it is inherently dangerous, plaintiffs rely upon the provisions of the Bureau of Reclamations Safety Handbook quoted supra, the statement in

United States v. Bay Area Painters and Decorators Joint Committee, D.C.N.D. Cal.1943, 49 F.Supp. 733, 737, that the court would take "judicial notice of the fact that the use of spray painting equipment constitutes a health hazard", and the testimony of Dr. Hine, an expert toxicologist, that, "Spray painting is more hazardous than brush painting because in the process the material is blown onto the surface, a number of droplets which are formed don't settle out and are suspended in the air, and the amount of vapors at a particular time in the air are greater than brush painting."

improper manner, we cannot escape the conclusion that O'Leary himself, and not either Hakes or the defendants, was in charge of the performance of the work. Under Ulmen v. Schwieger, defendants might be liable to the public or other third persons for any negligence of either Hakes or O'Leary. They are not liable to O'Leary himself.

In view of these conclusions, I feel that the motion for directed verdict must be granted. Prior to submission to the jury, it seemed advisable to defer any ruling. Now that the jury has failed to agree, no useful purpose would be served by a retrial prior to final determination of the questions discussed in this opinion. Moreover, both sides took extensive exceptions to the court's instructions. If my conclusions are erroneous and the appellate court should order a new trial, all issues may then be submitted to the jury in accordance with the views of the appellate court.