# THE BARNSTABLE.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST
CIRCUIT.

No. 178.   Argued March 8, 1901.—Decided May 13, 1901.

In a suit for a collision against a vessel navigated by charterers, it is competent for the court to entertain a petition by the general owners that the charterers be required to appear and show cause why they should not be held primarily liable for the damages occasioned by the collision.

A ship is liable *in rem* for damages occasioned by a collision through the negligence of the charterers having her in possession and navigating her.

If a stipulation in the charter party that "the owners shall pay for the insurance on the vessel" imposes any other duty on the owner than that of paying the premiums, it goes no farther than to render them liable for losses covered by an ordinary policy of insurance against perils of the

sea; and as such policy would not cover damage done to another vessel by a collision with the vessel insured, the primary liability for such damage rests upon the charterers, who undertook to navigate the vessel with their own officers and crew, and not upon the owners.

THIS case originated in a libel by the owners of the schooner Fortuna against the British steamship Barnstable, for a collision which took place off Cape Cod on January 13, 1896, and resulted in a total loss of the schooner, and the personal effects of her master and crew. Nine of the crew were drowned.

A claim was interposed by the master of the Barnstable on behalf of the Turret Steamshipping Company, a British corporation, and the owner of the steamship; and an order was subsequently entered substituting that corporation as claimant.

Before the time to answer expired, the Turret Company presented a petition, setting forth that at the time of the collision the Barnstable was chartered to the Boston Fruit Company, a Massachusetts corporation; that the charterer supplied its own officers and crew, who were navigating the vessel at the time of the collision, and that, if there were any faults on the part of the Barnstable, they were the faults of the charterer and not those of the owner. In compliance with the prayer, a summons was issued to the Boston Fruit Company to appear before the District Court to answer the petition. The company appeared and answered, admitting the charter, (copy of which was annexed to the petition,) but denying liability for the negligence of the officers and crew of the steamship, or that it had assumed liability therefor under its charter.

Subsequently, however, but after certain testimony had been taken, counsel for the owners and also for the charterer became satisfied that the Barnstable was in fault, and assented to a decree against her, leaving the question of liability as between the owner and charterer to be passed upon by the court.

The material provisions of the charter party, which was for thirty-six months from March, 1894, were that the charterer should "provide and pay for all oils and stores for the vessel, gear, tackle and appliances for loading and discharging the cargo, and for all the provisions and wages of the captain, officers, engineers, firemen and crew, who, except the guarantee

engineer, shall be appointed by them;" that the owners should "maintain the vessel in a thoroughly efficient state" for the service, but the charterer should " provide and pay for all the coals, fuel, port charges, pilotage, agencies, commissions and *all other charges whatsoever*, excepting for painting and repairs to hull and machinery and everything appertaining to keeping the ship in proper working order;" to pay for her use £550 per month, and that " in the event of loss of time from collision, stranding, want of repairs, break down of machinery, or any cause appertaining to the duties of the owner, preventing the working of the vessel for more than twenty-four working hours, the payment of hire shall cease from the hour when detention begins until she be again in an efficient state to assume her service." There was a final and most important provision, upon the construction of which the case turned, " that the owners shall pay for the insurance on the vessel."

The case, as thus presented between the owner and the charterer, was submitted to the District Court, which dismissed the owner's petition, holding it to be liable under the charter for the consequences of the collision. 84 Fed. Rep. 895. This decree was affirmed by the Circuit Court of Appeals. 94 Fed. Rep. 213.

*Mr. J. Parker Kirlin* for petitioner.

*Mr. Arthur H. Russell* opposing. *Mr. Charles Theodore Russell* was on his brief.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

The question involved in this case is, whether the owners of a vessel, who have let it out upon charter party and agreed to pay "for the insurance on the vessel," are liable, as between themselves and the charterers, for damage done to another vessel by a collision resulting from the negligence of the officers and crew, who are appointed and paid by the charterers.

1. It was within the power of the court, under general Ad-

miralty Rule 59, to entertain the petition of the Turret Steam-shipping Company, owner and claimant of the Barnstable, and to call in the charterer to show cause why it should not be condemned for the damage resulting from this collision. *The Alert*, 40 Fed. Rep. 836. Such proceeding, though not within the words, is clearly within the spirit of the rule; and the case, as between the Turret Company and the Fruit Company, there-after proceeded substantially as an independent cause, in which the original libellants had no substantial interest, their claim being adequately protected by the decree against the Barnsta-ble. The position of the Turret Company was in no manner affected by the failure of the libellants to appeal from their own decree.

2. Whatever may be the English rule with respect to the liability of a vessel for damages occasioned by the neglect of the charterer, as to which there appears to be some doubt, *The Ticonderoga*, Swabey, 215; *The Lemington*, 2 Asp. Mar. Law Ca. 475; *The Ruby Queen*, Lush. 266; *The Tasmania*, 13 P. D. 110; *The Parlement Belge*, 5 P. D. 197; *The Castlegate*, (1893) App. Ca. 38, 52; *The Utopia*, (1893) App. Cas. 492, the law in this country is entirely well settled, that the ship itself is to be treated in some sense as a principal, and as personally liable for the negligence of any one who is lawfully in possession of her, whether as owner or charterer. *The Little Charles*, 1 Brock. 347, 354. It was said by this court in the case of *The Palmyra*, 12 Wheat. 1, 14, referring to a seizure in a revenue case: "The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing; and this whether the offence be *malum prohibitum* or *malum in se*. The same principle applies to proceedings *in rem*, on seizure in the admir-alty." So in *United States* v. *Brig Malek Adhel*, 2 How. 210, speaking of a forfeiture incurred by a piratical aggression, Mr. Justice Story remarked (p. 233): "That the act makes no ex-ception whatsoever, whether the aggression be with or without the coöperation of the owners. The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner. . . .

It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which, or by which, or by the master or crew thereof, a wrong or offence has been done, as the offender, without any regard whatsoever to the personal misconduct or the personal responsibility of the owner thereof." This was the principle upon which this court held, in the case of *The China*, 7 Wall. 53, that a vessel was liable for a collision occasioned by the fault of a compulsory pilot— a marked distinction from the English rule, which, by statute, exempts the vessel from such consequences.

Indeed, the liability of the vessel for the negligence of the charterers is now fixed by statute in this country. Rev. Stat. sec. 4286. " The charterer of any vessel, in case he shall man, victual and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this title relating to the limitation of the liability of owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof."

As the charterers hired the Barnstable for a definite period, and agreed to select their own officers and crew, and pay all the running current expenses of the vessel, including the expense of loading and discharging cargoes—the owners only assuming to deliver the vessel to the charterers in good order and condition, and to maintain her in an efficient state during the existence of the charter party, there can be no doubt that, irrespective of any special provision to the contrary, the charterers would be liable for the consequences of negligence in her navigation, and would be bound to return the steamer to her owners free from any lien of their own contracting, or caused by their own fault. *Thorp.* v. *Hammond*, 12 Wall. 408 ; *Williams* v. *Hays*, 143 N. Y. 442 ; *Scott* v. *Scott*, 2 Starkie, 386 ; *Webster* v. *Disharoon*, 64 Fed. Rep. 143 ; *Galzoni* v. *Tyler*, 64 Cal. 334, 386.

This, indeed, is but the application to charter parties of the ordinary law of bailment, which requires that the bailee return the property to the owner in the condition in which it was received, less the ordinary results of wear and tear, and such in-

juries as are caused by a peril of the sea, or inevitable accident. *Coupé Co.* v. *Maddick*, (1891) 2 Q. B. 413 ; *Sturm* v. *Boker*, 150 U. S. 312; Story on Bailments, secs. 25 to 32.

If, then, the owners be liable for the negligence of the charterers, such liability must arise from the particular stipulation in the charter party that "the owners shall pay for the insurance on the vessel." The language of the clause is peculiar and significant. It is not an agreement to *insure*, or to procure or provide insurance, but to *pay for* such insurance as the owner should see fit to take out—and perhaps inferentially to apply such insurance toward the extinguishment of any liability of the charterers for losses covered by the policy. It is entirely clear that, under this stipulation, the owners could not charge the charterers with the expense of insurance, that is, the premiums, whatever form of policy the owner might select, though insurance be in fact a part of the running expenses of the vessel, and perhaps, in the absence of a special clause, covered by the stipulation that "the charterers shall provide and pay for all the coals and fuel, port charges, pilotages, agencies, commissions, *and all other charges whatsoever*, except for painting and repairs to hull and machinery, and anything appertaining to keeping the ship in proper working order."

It may be conceded, however, that for any damage to the vessel coverable by an ordinary policy of insurance "on the vessel" the owners must look to the companies, at least for the insured proportion of such damage, and not to the charterers. It may also be conceded that the owner might have selected a form of policy containing a special running-down clause that would have covered damages done to another vessel, though the rule in this court is, following the English case of *De Vaux* v. *Salvador*, 4 Ad. & El. 420, that an ordinary policy against perils of the sea does not cover damage done to another vessel by collision. *Gen. Mutual Ins. Co.* v. *Sherwood*, 14 How. 351. Mr. Justice Curtis remarked in this case (p. 363): "We believe that, if skillful merchants, or underwriters, or lawyers, accustomed to the practice of the commercial law, had been asked whether the insurers on one vessel were liable for damage done to another vessel, not insured by the policy, by a col-

lision occasioned by the negligence of those on board the vessel injured, they would, down to a very recent period, have answered unhesitatingly in the negative." This case was decided in 1853, although shortly before that the Supreme Court of Massachusetts had held in *Nelson* v. *Suffolk Ins. Co.*, 8 Cush. 477, that a policy on the vessel covered damages which the vessel insured might do to another vessel. The same view had already been taken by Mr. Justice Story in *Hale* v. *Washington Ins. Co.*, 2 Story, 176. In speaking of these cases Mr. Justice Curtis observed (p. 367): " But with great respect for that eminent judge, and for that learned and able court, we think the rule we adopt is more in conformity with sound principle, as well as with the practical interpretation of the contract by underwriters and merchants, and that it is the safer and more expedient rule. We cannot doubt that the knowledge by owners, masters and seamen that underwriters were responsible for all the damage done by collision with other vessels through their negligence would tend to relax their vigilance and materially enhance the perils, both to life and property, arising from this case [cause]." As the construction of a policy of insurance is one of general rather than one of local law, (*Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 443; *Gloucester Ins. Co.* v. *Younger*, 2 Curt. 322,) we are constrained to adopt our own views as to such construction, though the courts of the State in which the cause of action arose have adopted a different view.

But, whatever be the obligation as between the insured and his underwriters, this clause in the charter party should be construed in consonance with its other provisions, and with the obvious intention of the parties that the duty of the owner is discharged by keeping the vessel in good order and condition, and that the charterers assumed and agreed to pay all her running expenses. Conceding that damages done to another vessel are neither the one nor the other, they are incident rather to the navigation than to the preservation of the vessel, although the cost of the premiums may be referable to the preservation of the ship, inasmuch as the owner obtains the benefit of them in case of damages or loss, for which, as between him and the char-

terer, he is chargeable. If the responsibility for an extraordinary class of damages that is done to another vessel be thus shifted from the charterer, by whose agents the damage is done, and to whom its reimbursement properly belongs, to the owners, it should be evidenced by some definite undertaking to that effect, and not be inferred from an obscure provision of the charter party, which seems to have been designed for a different purpose. It is scarcely credible that the owners could have intended to assume a liability for the acts of men not chosen by themselves and entirely beyond their control, which in this case equalled the hire of the ship for eight months, and might, had the Fortuna been of greater value, have exceeded the whole amount of rent payable by the charterers.

There is undoubtedly weight to be given to the proposition that, unless we hold the owners liable for everything a policy of insurance could have covered, the clause is of little value, since the charterers would not in any event be liable for damages resulting from the perils of the sea or other risks ordinarily covered by insurance upon the vessel. But this argument loses much of its force in view of the ruling of this court that an ordinary policy of insurance on a vessel does not cover damages done to another vessel; and as there seems to be a difference in practice, some charters providing that the insurance shall be paid by the charterer, *Latson* v. *Sturm*, 2 Ben. 327, and others providing that it shall be paid by the owner, we think the probable object of the clause was to fix beyond cavil the responsibility for premiums. It was probably inserted in this charter to negative the inference derivable from that provision of the charter, imposing upon the charterers the obligation to pay the running expenses of the vessel, and *all other charges whatsoever*. But, however this may be, we find ourselves unable to give it the broad construction that it was intended to fix upon the owners a new and extraordinary liability, which we think could not have been within the contemplation of the parties.

The evidence of a parol understanding as to the meaning of the insurance clause in this connection, is entitled to no weight whatever. In answer to a question put to the broker who negotiated the charter, upon cross examination, he testified as follows:

"Q. You have had no experience, I understand you, of the actual working out of this clause in any particular cases?

"A. I have had considerable experience in various insurance claims—so much so that I clearly expressed to the owner that he would have to pay for all insurance on the vessel in any way, shape or manner against stranding, collision and everything, as is usually done in all vessels, unless he wanted to take the risk and not insure.

"Q. Tell us what experience you have actually had of these insurance clauses, or the working out of them.

"A. I have never known an owner to insure a charter for damage by collision before. He has always taken that risk."

Several answers may be made as to any inference derivable from this testimony. In the first place, the answer to the first question was not responsive to the question at all. In the second place, it was not the testimony of an expert as to the meaning of this clause among underwriters, and their customers, in which case it might properly have been admissible, but an attempt in respect to the particular charter, to introduce the antecedent understanding of the parties, and thereby to explain, control and qualify, the language of the charter. This was obviously impossible. *Seitz* v. *Brewers' Refrigerating Machine Co.*, 141 U. S. 510. Finally, giving to the answer *its* full effect, his statement of the owner's liability does not include damage which might be done to other vessels.

The statement of the witness, too, differs from his testimony upon direct examination, which was as follows:

"Q. Did you have any conversation with Mr. Craggs (the then owner of the vessel) with regard to that clause?

"A. I did; several.

"Q. Please state the substance of that conversation.

"A. I told him that he would have to insure for his vessel the same as the charter party stated.

"Q. Did he make any reply?

"A. Of course, I told him if he did not want to insure, he could take that risk. But his intention was to insure."

In addition to this, however, the testimony was quite inadmissible as against the Turret Steamshipping Company, the

purchaser of the vessel and the assignee of the charter party, since it was not shown to have had any notice of the conversation, and therefore, in taking over the charter, was only bound by the obligations imported by the words of the insurance clause in their ordinary commercial sense. *Paige* v. *Cagwin*, 7 Hill, 361; *Bristol* v. *Dann*, 12 Wend. 142; *Clews* v. *Kehr*, 90 N. Y. 633; *Truax* v. *Slater*, 86 N. Y. 630; *Tabor* v. *Van Tassell*, 86 N. Y. 642.

In conclusion, we are of opinion that, if anything more were intended by the insurance clause than to impose on the owners the duty of paying the premiums, it was fully satisfied by an ordinary policy of insurance against perils of the sea; that such policy would not cover damage done to another vessel by a collision with the vessel insured, and that the primary liability for such damage rested upon the charterers and not upon the owners. We express no opinion as to the effect of any payment that may have been actually made by the underwriters upon this loss.

*The decrees of both courts must therefore be reversed, and the case remanded to the District Court for the District of Massachusetts, for further proceedings not inconsistent with this opinion.*