## THE DRAYTON THURSTON.
## THE INLAND.
## THE EDWIN CHILTON.
### No. 1768.

District Court, W. D. New York.

April 11, 1933.

river at that point is approximately 200 feet. There was a barge of about 22-foot beam at the Nisbet Elevator on the starboard side of the river at this point. The Chilton and tow came on through the draw, and the barge Drayton Thurston came in contact with the Inland, and damages were sustained for which this libel has been brought. Proof on the part of the respondent Inland is that the barge and tow were proceeding at a rate of six to seven miles an hour when the collision occurred.

The beam of the Inland was 42 feet, that of the Chilton 20.2 feet, and that of each towed barge 22 feet. Locating the Inland 65 feet from the port side and including the width of the barge docked at the Nisbet Elevator, the width of clear water for passage would be 61 feet. The lift of the bridge was 100 feet in width, and was located on the Chilton's port side. Proceeding through the lift on its starboard side, the Chilton and tow were headed almost directly to the open water beyond.

Inland's captain testified that in making for port side he was taking the usual and proper course to make the draw. Why this is so does not appear. To pass the barge at Nisbet Elevator, it was necessary to swing to the port side but not to the point taken by the Inland. However, whether or not the course taken was the usual one, the libelant cannot recover against the respondent Inland. There is no rule or law of navigation which required these boats, under the circumstances shown here, to navigate each on its starboard side of the channel. The Inland gave the proper two-blast signal that it proposed to pass on the port side, and this was assented to by the proper reply whistle. The Chilton and tow were proceeding at an excessive speed.

Libelant claims that the statutory rules for navigating the inland waters of the United States (Act June 7, 1897 [33 USCA § 210 et seq.]) required the Inland to keep to her starboard side. The title of that act (30 Stat. 96) expressly excludes the Great Lakes and their connecting and tributary waters from its application, and the rules for these tributary waters, such as the Buffalo river, are specifically laid down in the separate statute, chapter 64, Act of February 8, 1895, chapter 4, title 33 USCA, § 241 et seq.

If we assume that the statutory rules for navigating inland waters are applicable, Article 25 (33 USCA § 210), the so-called Starboard Side Rule, is qualified or modified by article 27 (33 USCA § 212), which recognizes

Single & Hill, of New York City, and Harry J. Kelly, of Buffalo, N. Y., for libelant.

Brown, Ely & Richards, of Buffalo, N. Y., for respondent The Inland and claimant-petitioner Iroquois S. S. Corporation.

Burke & Desmond, of Buffalo, N. Y., for impleaded respondent The Edwin Chilton and claimant Marine Transit Corporation.

KNIGHT, District Judge.

On August 13, 1929, the steamer Inland, with a cargo of sulphur rock, was proceeding down the Buffalo river, Buffalo, N. Y. Approaching a bend in the river, the Inland blew one blast of her whistle. It is not denied that there was no response. The steamer was then approaching the Ohio street bridge, and following the single blast blew three blasts for the lift. The Inland was then making for her port side of the river, and, as the lift was raised, the tug Chilton, with barges Drayton Thurston and Rita Thurston in tow, was seen on the other side approaching the lift. The undisputed evidence shows that the Inland then blew a two-blast signal and that the Chilton answered with the same signal. The Inland came to a stop approximately 300 feet from the bridge and 50 to 65 feet from the port side of the dock. The width of the

that the Starboard Side Rule is not infallible. Rule 23, chapter 4, title 33 USCA (section 288), specifies the passing signals to be given and Rule 6 of the Inspectors Pilot Rules provides that one long blast of the whistle be given by a boat approaching a bend or curve. It further provides that, if such blast of the whistle is not answered, the channel may be considered clear. In this case, the one-blast bend signal was given and was not answered. Rules 17, 24, and 25 (33 USCA §§ 282, 289, 290), clearly contemplate circumstances under which vessels may pass in the portion of the channel which lies on the port side of each.

All the cases cited by libelant on the question of passing signals arose in connection with collisions on waters other than the Great Lakes or their connecting or tributary waters. The Titan (C. C. A.) 49 F. 479; Nereus (D. C.) 23 F. 448; Occidental & O. S. S. Co. v. Smith (C. C. A.) 74 F. 261; The Hokendaqua (C. C. A.) 251 F. 562; The Hokendaqua (D. C.) 270 F. 270; The Victory & The Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519. I do not think that the cases cited by libelant with regard to the duty of free and unincumbered vessels have application, for the reason that the Inland had come to a full stop and in a position to permit passage of the incumbered vessel.

■ Counsel for libelant in his brief disputes the claim that the Chilton was traveling six miles per hour, but no evidence to the contrary was offered. The excuse for the speed is that it was necessary for control of the tow, but no testimony was offered to show that a speed of six miles per hour was necessary to secure this control. On the other hand, the rules of navigation for the Great Lakes and connecting waters require steam vessels about to meet and pass in channels less than 500 feet in width to slow down to a moderate speed according to the circumstances. Rule 25 (33 USCA § 290). There is no doubt about the Inland's compliance with this rule. Likewise there is no doubt about the Chilton's failure to observe it. It is apparent that no definite speed rule applicable to all conditions and circumstances can be made. Speed must be regulated in accord with the width of the channel, usual traffic conditions, and unusual and not expected emergencies. "The test of speed is whether the speed is such as allows the vessel to comply with the duty imposed upon her." 11 C. J. 1158, and numerous authorities cited.

The Chilton saw, or should have seen, that the Inland had stopped and that the channel which remained between the Inland and the moored barge would allow a comparatively small clearance. Knowing this, the Chilton elected to proceed at unreduced speed, and consequently, as the result of its own negligence, found itself in difficulty when it attempted to make the passing. A sharp turn to port was made by the tug in an attempt to sheer the barges away from the Inland, but it resulted in a starboard swing of the stern of the barges with the collision resulting. Had the Chilton been proceeding at a reduced rate of speed, it is reasonable to believe that a much greater degree of control over the barges would have been possible.

The libelant offered no direct proof to contradict the movements of the boats as claimed by respondent Inland, and relies mainly upon the provisions of the statutory rule, article 25 (33 USCA § 210), and the inferences which he claims must be drawn from the testimony given by respondent. Libelant has not sustained the burden of proof cast upon him, and therefore cannot recover against the Inland.

■ The libel in this action was filed by the owner of the barge Drayton Thurston against the Inland. The Iroquois Steamship Corporation made claim to the Inland and impleaded the tug Edwin Chilton. The Marine Transportation Company intervened as claimant. The answer of the respondent impleaded set forth a contract between the respondent impleaded and the libelant containing this provision: "The barges are to be insured for the benefit of both parties under policy as agreed upon and nothing herein contained shall make either parties of this agreement liable beyond the terms of the insurance policy." It was stipulated on the trial that insurance under this provision was in effect at the time of the collision. In this circuit the law is settled that a contract by which the tow releases from or limits the liability of the tug is valid. The Oceanica (C. C. A.) 170 F. 893; Ten Eyck v. Director General (C. C. A.) 267 F. 974; The Dalzellite (D. C.) 48 F.(2d) 598, 599; The Niels R. Finson (D. C.) 52 F.(2d) 795. The condition in this contract is broadly drawn. The policy has not been offered in evidence. The libel alleges no act of negligence or liability on the part of the Chilton, nor is there anything in the case to show who was in control of the Chilton. Under these circumstances it must be found that the effect of the charter provision is to release the Chilton from liability to the tow. The Oceanica, supra; The Barnstable, 181 U. S. 464, 21 S. Ct. 684, 45 L. Ed. 954; Newport News Shipbuilding

Co. v. United States (C. C. A.) 34 F.(2d) 100.

The libel must be dismissed, with costs.