Jesse NOEL, Appellant,

v.

ISBRANDTSEN COMPANY, Incorporated, a corporation, and United States of America, Appellees.

No. 8150.

United States Court of Appeals Fourth Circuit.

Argued Jan. 25, 1961.

Decided March 9, 1961.

Henry E. Howell, Jr., Norfolk, Va. (Howell, Anninos & Daugherty, Norfolk, Va., on the brief), for appellant.

John W. Winston, Norfolk, Va. (Joseph S. Bambacus, U. S. Atty., Richmond, Va., on the brief), for appellees.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

A marine surveyor who sustained injuries in a fall while engaged in an inspection of the steamship William Bevan, owned by the United States and under bare-boat charter to Isbrandtsen Company, filed a three-pronged libel in admiralty. The libellant, Jesse Noel, described his action as one *in personam* against the United States and Isbrandtsen upon the familiar grounds, first, unseaworthiness of the vessel, and second,

negligence of the respondents. His third cause of action was a libel *in rem* against the vessel upon a novel theory of the ship's liability for personal injury, apart from her unseaworthiness or the negligence of any person. The contention, in short, is that the vessel is not only security for the owner's or charterer's liability, but that she is a separate entity capable of committing torts for which she may be held accountable. This appeal is from the order dismissing the libel.

In September, 1956, when the United States Government as owner made the bare-boat charter to Isbrandtsen, the steamship was part of the James River Reserve Fleet, a "moth ball" fleet of vessels out of commission. The charter was to have a duration of one year, and the William Bevan was to carry coal from ports on the East Coast of the United States to markets in Europe. It was stipulated that Isbrandtsen should put the vessel in operating condition and then, at the expiration of the year, after repairing any damage which might occur during the charter period, Isbrandtsen should prepare her for lay up. Pursuant to these terms, Isbrandtsen had a New York shipyard perform the necessary work of restoring the ship to operating condition. She then entered the coal trade and made eight trans-Atlantic crossings from Hampton Roads, Virginia, with cargos of coal.

Isbrandtsen notified the United States of its intention to terminate the charter in September, 1957, and directed the master of the vessel to deliver her to the Newport News Shipbuilding and Drydock Company at Newport News, Virginia, to be there prepared for return to the idle fleet in the James River. Jesse Noel was engaged by the charterer to represent it in an off-hire survey to determine what repairs were needed to restore the ship to the condition it was in at the commencement of the charter and to inspect all work to be done by employees of Newport News Shipbuilding Company to make the vessel's condition conform with the Maritime Commission requirements for return to the idle fleet.

Upon the vessel's arrival in Newport News on August 26, 1957, Noel and a representative of the Maritime Commission boarded her and started the off-hire survey. On the day of the ship's arrival her engines were shut down and thereafter no steam power or electricity was available aboard. Also, the articles were terminated and the vast majority of the crew was dismissed. Only the captain, chief engineer, chief mate, first assistant mate, steward and one or two others remained aboard. The employment of the remaining members of the crew was on a day-to-day basis only, to take inventory of equipment and tools and to separate Maritime Commission gear from Isbrandtsen gear. They neither ate nor slept on the vessel, and as each finished his part in the inventorying process he departed.

On September 5, 1957, Noel, still engaged in his survey, entered into No. 2 'tween deck to inspect the cleaning work which had been done there. Standing on the deck, he was unable to determine whether an overhead beam had been properly cleaned, and in order to make a visual inspection Noel started to climb the battens on the port side of the No. 2 'tween deck. Not all the battens were in place, but he climbed until his feet were on the top batten then in position. For balance, he reached for a higher batten clip near the top of the 'tween deck. As he took hold with one hand—there being no batten in the clip—the clip broke in half and Noel fell to the deck, sustaining the injury complained of.

The case was tried without a jury and the District Judge made two findings which he considered dispositive of the case. He found that there was no showing of negligence as to either defendant; he also found that at the time of the accident the William Bevan was a "dead ship" which had been withdrawn from navigation, and that in such circumstances no obligation of seaworthiness is imposed by law. The opinion of the District Court contains no reference to the *in rem* claim asserted against the ship, apparently because the District Judge

considered that there could be no liability on the part of the ship when neither the owner nor the bare-boat charterer was negligent and the warranty of seaworthiness was not applicable.

## I. The Negligence Count

The claimed negligence was that the batten clip, made of cylindrical steel ⅜″ in diameter, was inadequate and that a larger sized clip should have been used. There was conflicting testimony as to this, and the District Judge apparently accepted that of the defendant's witnesses. The actual cause of Noel's fall was, however, a defect at the angle of the L-shaped clip, which yielded under his weight. The finding of the court was that the defect had been painted over; it was not shown when. Perhaps the condition had existed since the ship's construction. In any event there was the court's finding, based upon testimony, that even the closest inspection would probably not have disclosed the defect. Under these circumstances it was determined that neither respondent could be held negligent. We perceive no error in this finding and conclusion.

## II. As to Unseaworthiness

The defense here to the action for unseaworthiness is that in the circumstances the warranty is not applicable. From West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, we learn that in determining this question we are to look to the status of the vessel at the time of the accident. In West the vessel had been taken from the "moth ball" fleet to the shipyard for major overhaul in preparation for return to service; it had not yet been readied to resume service. In the present case the vessel had actually been withdrawn from service and delivered to the shipyard to prepare her for return to the "moth ball" fleet,[1] and she was no longer

available to perform ship's service. In both cases the vessel was out of navigation when the injury happened. The William Bevan was a "dead ship" because she was no longer in service. The changes made in her at the shipyard are merely evidence under the particular circumstances that her sailing career had been effectually terminated. In this sense she was "dead." A body is not less dead in the interval between expiration and interment, while it is still in the hands of the embalmer.

In the recent case of Roper v. United States, 4 Cir., 1960, 282 F.2d 413, a longshoreman on a vessel that had but recently been removed from the "moth ball" fleet was injured while unloading cargo. The writer of this opinion differed with the majority as to whether that was a "dead ship," but here there is no room to doubt the William Bevan's status. She was no longer performing nor was she able or expected to perform any of a vessel's duties. We are unhesitatingly of the opinion that she was completely and permanently withdrawn from service and hence the warranty of seaworthiness was not applicable.

In the view we take it becomes unnecessary to decide whether under other circumstances a marine surveyor might or might not be entitled to the warranty of seaworthiness.

## III. In Rem Action

It is contended, however, in support of the *in rem* action that a ship as an entity is capable of committing torts for which she is accountable, irrespective of any warranty of seaworthiness or any showing of fault on the part of those who own or control her, and that, therefore, the District Court's failure to consider the *in rem* libel constitutes reversible error.

1. By September 5, 1957, the day of the accident, the process of physical conversion of this deactivated ship was advanced to the point where she had been stripped of her supplies and equipment, and her pipes, machinery and boilers had been drained and filled with preservatives and grease. The propeller and tail shaft were secured and the rudder locked. All cargo gear and tackle had been stripped and stored. The cargo winches were inoperative and preserved.

For this proposition we are referred to language in several early American cases, but these fail to support the appellant's argument, because the language was addressed to situations readily distinguishable. It has been held, for example, that a vessel used for an illegal purpose, such as the violation of an embargo [2] or for piracy,[3] may be seized and condemned in spite of the innocence of the owners. It should be noted, however, that these cases did not decide that a vessel might be condemned and sold where no violation had been committed by someone in control.[4] It is one thing to hold that a conviction or liability *in personam* is not a condition precedent to the action *in rem*; it would be quite another to say that the vessel may be held accountable as an entity when there has been no violation of the warranty of seaworthiness or a breach of duty on the part of anyone.

Even in actions against a vessel upon claims sounding in tort (distinguished from unseaworthiness), where the concept of her liability despite the owner's non-liability has been applied, recovery has always been predicated on a showing of fault on the part of someone.[5] This doctrine of *in rem* liability has been extended to a ship under bare-boat charter, but not in the absence of proof of negligence of the crew "appointed and paid by the charterers." The Barnsta-

ble, 1901, 181 U.S. 464, 21 S.Ct. 684, 685. 45 L.Ed. 954.

Certainly, the case of Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, also relied upon by the appellant, does not deviate from the Barnstable ruling. It is true that in upholding an *in rem* action, Judge Learned Hand, writing for the majority, stated:

"* * * we see no reason why a person's property should never be liable unless he or someone else is liable 'in personam.'" 232 F.2d at page 924.

In a later opinion, however, Latus v. United States, 2 Cir., 1960, 277 F.2d 264, Judge Hand makes it clear that his statement in Grillea is applicable only in an action for unseaworthiness. He explained:

"Grillea v. United States, 2 Cir., 232 F.2d 919 merely held that a longshoreman might sue a ship *in rem* if he were injured by her *unseaworthiness,* which no one denies." (Emphasis supplied.) 277 F.2d at page 267.[6]

It would be strange indeed if such a cause of action as is here asserted against the ship could exist in the law without attention having been called to it in the numerous cases which have been litigated upon the theory of negligence and unseaworthiness. If a species of liability for personal injuries could be

---

2. The Little Charles, C.C.D.Va.1819, 26 Fed.Cas. page 979, Case No. 15,612.

3. United States v. Malek Adhel, 1844, 2 How. 210, 43 U.S. 210, 11 L.Ed. 239.

4. This is made abundantly clear by the Supreme Court's final disposition in the case of The Palmyra, 1825, 12 Wheat. 1, 6 L.Ed. 531. There the Court found itself evenly divided on the question of whether the crew had actually engaged in piracy and, therefore, The Palmyra was not condemned.

5. In The China, 1868, 7 Wall. 53, 19 L. Ed. 67, the Supreme Court recognized the *in rem* liability of a vessel involved in a collision while commanded by a compulsory pilot. The owner was excused from personal liability because it could not be said that the compulsory pilot was

his agent; however, the *in rem* liability arose only after it was established that the pilot was at fault.

6. In light of Judge Hand's opinion in The Carlotta, 2 Cir., 1931, 48 F.2d 110, 112 in which the fiction of a vessel as a tortfeasor was referred to by him as an "archaic * * * an animistic survival from remote times * * * based on added irrational fictions," and his opinion in Latus, it would be incongruous to construe his statement in Grillea as support for libellant's theory. See also his opinion in Burns Bros. v. Central R. R. of New Jersey, 2 Cir., 1953, 202 F.2d 910, for an interesting discussion in which he traces the historical development of the fiction from the concept of deodand.

maintained against the ship without regard to seaworthiness or fault on anyone's part, then plaintiffs, usually not lacking in alertness, have been singularly neglectful in asserting rights of this character. Why debate issues of seaworthiness or negligence if the vessel is responsible anyway? Surely in many of the contested cases the vessel was not beyond the reach of process, and use of the suggested theory, if supportable, would have been attempted. We know no precedent for requiring her to respond as an absolute insurer for personal injury where there has been no violation of any warranty of seaworthiness and it is not established that anyone connected with her has been at fault. Essentially, the libellant's position amounts to an insistence that even if there is no liability for unseaworthiness because in legal contemplation the "ship" is no longer a ship, there should still be recovery as though for unseaworthiness.

Affirmed.