**OFFSHORE TELEPHONE COMPANY**

v.

**M/V WATERBUCK, M/V STATE POINT, their tackle, etc., in rem Mobil Oil Corporation, Penrod Drilling Company, National Boat Corporation of Delaware, Inc., in personam.**

Civ. A. No. 76–3658.

United States District Court,
E. D. Louisiana.

Feb. 21, 1979.

Ralph E. Smith, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

James M. Tompkins, McGlinchey, Stafford, Mintz & Hoffman, New Orleans, La., James O. M. Womack, Burke & Ballard, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge.

This civil action arises out of a maritime tort that occurred in Vermilion Block 131 approximately ninety (90) to one hundred (100) miles south of Morgan City, Louisiana. Trial of this matter was held on December 4, 1978, after which the parties were afforded the opportunity to present additional briefs. The Court then took the matter under submission.

### FINDINGS OF FACT

1. Offshore Telephone Company, also referred to as the Louisiana Offshore Telephone Company (hereinafter "Offshore") is the owner of a submerged telephone cable located on the floor of the Gulf of Mexico, between an offshore drilling and production platform in Vermilion Block 131 and another platform in South Marsh Island Block 6.

2. Mobil Oil Corporation (hereinafter "Mobil") was preparing to drill in Vermilion Block 131. On November 6, 1975, the movable drilling rig engaged by Mobil, Transworld No. 54, arrived on location.

3. Mobil entered into blanket bareboat charters with Penrod Drilling Company (hereinafter "Penrod") for the M/V WATERBUCK, and with National Boat Corporation (hereinafter "National") for M/V STATE POINT. These vessels were chartered to supply offshore services to the Mobil rig in Vermilion Block 131, and thus constituted part of Mobil's normal operations.

4. Under the applicable terms of the Charter Party Agreements Mobil, as the demise charterer, was responsible for procuring and maintaining the required P & I insurance coverage on the M/V WATERBUCK and the M/V STATE POINT. These agreements were respectively signed by the representatives of Mobil, Penrod, and National. The Charter Party Agreements further provided that the operating agreement would shift the responsibility of procuring and maintaining the insurance from the charterer to the operator and/or contractor. However, in neither Charter Party Agreement was an operator denominated, nor did anyone sign in the capacity as an operator and/or contractor, nor was a separate operator and/or contractor agreement submitted into evidence.

5. On November 23, 1975, the date of the incident in suit, there was in effect between Mobil and Offshore a Lease Agreement dated October 31, 1966, and a Communication Agreement dated July 6, 1970. The pertinent terms of the Lease Agreement provided:

> Lessee [Offshore] further agrees to relocate or otherwise protect at Lessee's sole expense submarine cables in the event of interference with Lessor's [Mobil] normal operations. Lessee further agrees not to hold Lessor responsible for damages to Lessee's cables or other equipment due to Lessor's normal operations, although Lessor agrees to take normal precautions in this regard. Lessee further agrees to be responsible for relocating and marking cable in any area, upon thirty (30) days' notice by Lessor, where work is to be done by Lessor which would make such relocation or marking reasonably necessary.

The Communications Service Agreement applicable between Mobil, as Company, and Offshore, as Contractor, provides, *inter alia*:

> CONTRACTOR [Offshore] further agrees that COMPANY [Mobil] shall not be liable or responsible for damage to CONTRACTOR'S risers or cables resulting from COMPANY'S normal operations, although COMPANY agrees to take normal precautions to prevent damages to CONTRACTOR'S property.

Paragraph X of the Communications Service Agreement and p. 4 of the Lease Agreement further provide:

> CONTRACTOR shall protect, indemnify and save COMPANY harmless against any and all claims, demands and causes of action of every kind and character arising in favor of any person, including both COMPANY'S and CONTRACTOR'S employees, on account of personal injuries or death, or damage to property occurring, growing out of, incident to, or resulting directly or indirectly from, the work to be performed by CONTRACTOR hereunder, whether such loss, damage, injury or liability arises from or is contributed to by the negligence of COMPANY or its employees, and whether due to imperfection of any material furnished by COMPANY, or the premises themselves or any equipment thereon, whether latent or patent, or for any other cause whatsoever.

6. Prior to, and after the rig was placed on location, Mobil, through its Communications Supervisor for the New Orleans Division, Paul Koehn, notified Charles L. Johns, Communications Manager for Offshore, on several occasions that operations were being undertaken in the vicinity of Vermilion Block 131 and that buoys identifying the placement of the cable would be required.

7. This notice and request was disregarded by Offshore.[1]

8. In the early morning of November 23, 1975, the M/V WATERBUCK and the M/V STATE POINT arrived at the Mobil rig in Vermilion Block 131. Weather conditions would not permit either vessel to tie up to the rig as was the custom. Consequently, each vessel stood by at anchor.

9. Prior to the arrival of the M/V WATERBUCK in Vermilion Block 131, Hubert Swire, the drilling supervisor foreman for Mobil, contacted the vessel by radio and requested that she call in before anchoring. Mr. Swire's purpose in making the request was to notify the Master of the M/V WATERBUCK of the obstructions in the area.

10. Upon arriving in Vermilion Block 131 the M/V WATERBUCK did not contact the Mobil pusher before she dropped her anchor.

11. On November 4, 1968, seven years prior to the casualty, the United States Coast Guard published Local Notice to Mariners No. 130, which advised that the Gulf Coast Telephone Company, the predecessor of Offshore, had installed and was operating a submarine coaxial cable communication system in the Gulf of Mexico offshore of the Louisiana coast. The Notice provided that when Coast and Geodetic Survey charts were updated the cables would be shown on C&GS Charts 1276, 1278, and 1116 or 1116A.

---

1. According to Koehn, Johns informed him that the cable would be buoyed. However, Johns testified that although Koehn called concerning the marking of the cables, he did not request that they be buoyed, but only inquired if Offshore desired to buoy the cable. Johns further stated that he received the approval of the Marine Department to buoy the cable but neglected to inform Mobil that it could be done at Mobil's expense. Having considered the respective duties of each party as delineated in the Lease Agreement and Communications Service Agreement, and based on the Court's observation of both witnesses, the Court attributes greater weight to the testimony of Mr. Koehn in regard to this discrepancy.

12. Captain Merlin A. Glynn did not have aboard the M/V STATE POINT Local Notice to Mariners No. 130 of 4 November 1968, for it was his practice to retain Local Notices for one year and then destroy them. On November 23, 1975, he utilized Charts 1116, 1117, and 1115 aboard the M/V STATE POINT, but Chart 1116 did not indicate the location of the cable.

13. Offshore has not sustained its burden of proof in demonstrating that the M/V WATERBUCK was unseaworthy, or unreasonably fit for navigation because of inadequate or deficient maps, charts, or notices.[2]

14. At approximately 7:00 A.M. on the morning of her arrival, the M/V WATERBUCK picked up her anchors to maneuver to the rig. In the process she picked up the submerged telephone cable of Offshore and proceeded to the rig where she dropped anchor while tying stern to the rig.[3]

15. Later the same day the M/V STATE POINT maneuvered to the rig without interfering with the cable.

16. Having completed her offloading, the M/V WATERBUCK got underway to Morgan City. When she was approximately a half mile from the rig, the bow of the M/V STATE POINT began to vibrate accompanied by a cacophony of clanging and banging against the rig. Investigation by the Master of the M/V STATE POINT revealed that this disturbance was produced by the cable riding up the anchor chain and around the bow of the M/V STATE POINT.

17. The cable was being towed by the anchor of the M/V WATERBUCK and was snapped when the vessel was about a half mile from the rig.[4]

18. The Master of the M/V STATE POINT immediately notified the Master of the M/V WATERBUCK that he had just broken a telephone cable. The Captain of the M/V WATERBUCK responded, "Yes, we know about it."

19. When the crew of the M/V STATE POINT completed its offloading operation, the cable was still strung across its anchor. Pursuant to the advice of the Mobil pusher, the M/V STATE POINT returned the cable to the general area in which it was originally located.

## CONCLUSIONS OF LAW

This Court has jurisdiction of an action for damage to a submarine telephone cable by a vessel or its anchors, by virtue of the admiralty and maritime subject matter of the claim involved. United States Constitution Article III, § 2; 28 U.S.C. § 1333; 46 U.S.C. § 740; Fed.R.Civ.P. 9(h).

### Negligence of Offshore Telephone Company

From the testimony and evidence presented in this matter, it is clear that the cable break was caused in large part by the negligent inaction of Offshore. According to the terms of the lease agreement between Offshore and Mobil, Offshore agreed to assume responsibility for marking or relocating the cable upon 30 days' notice by Mobil, where work was to be performed by Mobil which would make the marking or

---

2. The Court has not been presented any documents, nor the first syllable of testimony concerning the M/V WATERBUCK's navigational equipment. Offshore cannot rely upon its unsupported allegation of unseaworthiness.

3. This finding is substantiated on p. 28, et seq., of Captain Merlin A. Glynn's deposition and by the third floor log of Offshore's Central Distributing Office in Morgan City. On the morning of November 23, 1975, at approximately 0701, the electronic indicators in the Central Distributing Office indicated transmission problems with the telephone cable between South Marsh Block 6 and Vermilion Block 131.

4. This is documented in the Daily Master's Log of the M/V WATERBUCK wherein it is provided:

"Remarks By Master"
Anchored behind M/V STATE POINT. Dragged anchor over telephone cable—broke cable heaving in anchor. (Signed) Master William A. Hawley"

relocation reasonably necessary. The expense of this operation was to be borne solely by Offshore. On several occasions Mobil timely notified Offshore that work was planned that would make the marking of the cable reasonably necessary. The significance of the discrepancy between the testimony of Charles L. Johns of Offshore and Paul Koehn of Mobil as to whether the latter actually requested that the cable be buoyed or merely inquired if Offshore wanted to mark the telephone cable, dwindles in light of Offshore's contractual duty to mark or relocate the cable upon notice of activity by Mobil making such marking or relocation reasonably necessary.

■ Charles L. Johns did not conceal Mobil's request. In fact, Mr. Johns received authorization from the Marine Department of Offshore to buoy the cables. However, no effort was made by Offshore to buoy or otherwise identify the cable. Considering that Offshore knew, or should have known, that vessels would be anchoring in the vicinity of Transworld Rig. No. 54, its inertia was unreasonable.

### The Liability of Mobil Oil Corporation

■ As the demise charterer of the M/V WATERBUCK and the M/V STATE POINT Mobil is the owner *pro hac vice* of each vessel.[5] All *in personam* liabilities arising out of the ship's operation are brought home to Mobil as the demise charterer. As stated in Gilmore & Black, *The Law of Admiralty* (1975) pp. 218, 219:

> The vessel, so far as third persons are concerned, is his vessel, and the men are his men; such of their defaults as are attributable to the owner and employer under *respondeat superior* doctrines are his to answer for.

The Court concludes that Mobil, as the bareboat charterer of the M/V WATER-

BUCK, is concurrently negligent with Offshore. Mobil's fault does not arise out of its failure to provide the vessel with the most recent maps, charts, or Local Notices to Mariners, for there is no indication that the M/V WATERBUCK's navigational equipment was inadequate in this respect.[6] As the bareboat charterer of the M/V WATERBUCK, Mobil is liable for the consequences of negligence in her navigation and is bound to return the vessel free from any lien caused by its own fault. *The Barnstable*, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901); *Van Nood v. Federal Barge Lines, Inc.*, 282 F.Supp. 890, 892 (E.D.La.1968). The failure of the Master of the M/V WATERBUCK to radio the pusher of the Mobil rig in Vermilion Block 131 before lowering her anchors, after having been notified of obstructions in the area, is the negligent conduct which is imputed to Mobil as owner *pro hac vice*. The consequence of this omission was that the anchor of the M/V WATERBUCK became a grapnel that hoisted the cable from the floor of the Gulf and dragged it about until it broke.

### Liability of the M/V WATERBUCK

Based on the conclusion that Mobil is responsible for the negligence of the M/V WATERBUCK, the question is whether the vessel is liable *in rem* for the damages done by it while in the control of charterer. This issue was presented to the Supreme Court in *The Barnstable*, wherein the Court held:

> . . . the law in this country is entirely well settled that the ship itself is to be treated in some sense as a principal, and as personally liable for the negligence of anyone who is lawfully in possession of her, whether as owner or charterer. (181 U.S. at 467, 21 S.Ct. at 685)

---

**5.** The evidence does not support the contention of counsel for the M/V WATERBUCK that Mobil entered into operating agreements with Petrol Marine Company and State Boat Company for the M/V WATERBUCK and M/V STATE POINT, respectively. Therefore, the Court will not engage in speculation as to the possible effect that such agreements may have

had in determining the rights and liabilities of the parties to this litigation.

**6.** Offshore's failure to prove the unseaworthiness of the M/V WATERBUCK will also have a significant bearing on the *in personam* liability of Penrod, the owner of the vessel.

In holding that a lien could not be imposed on a ship for the fault of a person other than the owner, a "bareboat" charterer, or of some specified class of person like a compulsory pilot, Judge Learned Hand specifically recognized:

> . . . that when a ship is on "bareboat" charter, negligence of the crew "appointed and paid by the charterers" will charge the ship in rem. [*Latus v. U. S.*, 277 F.2d 264, 267 (2d Cir. 1960)]

■ Therefore, the M/V WATERBUCK is liable *in rem*.[7] However, as was noted in *The Barnstable, supra*, the primary liability for the damage that was done to the cable rested upon the charterer. In *United States v. Helen*, 164 F.2d 111, 112 (2d Cir. 1947) the court found the vessel liable *in rem* for a penalty incurred by discharging a quantity of lumber into the tidal waters of the New York harbor in violation of a federal statute. In rejecting the charterer's claim that it could not be held liable for the statutory penalty because the evidence indicated that the dunnage was thrown overboard by an independent contractor, the court held:

> But the charterer was bound to return the scow free from any maritime lien arising from use of the vessel during the term of the charter. (citing *The Barnstable*, inter alia)

Although the M/V WATERBUCK is liable *in rem*, Mobil as the bareboat charterer remains primarily liable for the negligence of the vessel.

### The M/V STATE POINT and National Boat Corporation

The Court finds that the M/V STATE POINT did not contribute to the damage sustained by Offshore. Accordingly, no liability shall attach to this vessel. Finding no causal connection between the M/V STATE POINT and the damage to Offshore's submerged cable, the Court also concludes that National, as owner of the vessel, is not liable.

### Liability of Penrod Drilling Company

■ Considering the issue of Penrod's liability it is noted at the outset that the plaintiff did not establish the unseaworthiness of the M/V WATERBUCK. This is significant because the unseaworthiness of a vessel may be grounds for imposing *in personam* liability on the shipowner, even in the presence of a bareboat charter agreement. *American Commercial Lines, Inc. v. The Valley Line Co.*, 529 F.2d 921, 923 (8th Cir. 1976); *Kerr-McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir. 1973). However, Offshore failed to sustain its burden of proof in proving the M/V WATERBUCK unseaworthy.

This Court again finds guidance in the seminal opinion of *The Barnstable, supra*. The Barnstable was involved in a collision that resulted in the sinking of another vessel. A proceeding *in rem* was initiated and the owner of the Barnstable appeared as claimant and the charterer was brought in as a third party defendant. The question posited for judicial decision was whether the owner or the charterer was ultimately liable. The court held:

> . . . that the primary liability for such damage rested upon the charterers, and not upon the owners. (181 U.S. at 473, 21 S.Ct. at 688)

In *Winter v. Eon Production, Ltd.*, 433 F.Supp. 742, 746 (E.D.La.1976) the court in making reference to demised vessels operated by the demisee's servants stated that the owner is not visited with personal liability for the tortious acts of those operating the vessel. The court reviewed the analogous case of *The China*, 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67 (1868) wherein the Supreme Court held that a vessel operated by a compulsory pilot was liable *in rem* for the negligent acts of the pilot. However, the court noted that the Supreme Court held soon thereafter that the owner was not liable *in personam* when the vessel was operated by a compulsory pilot; the rule of *The China*

---

**7.** See also, *Noel v. Isbrandtsen Co.*, 287 F.2d 783, 785–786 (4th Cir. 1961); *Rice v. New York Trap Rock Corp., et al.*, 294 F.2d 272 (2d Cir. 1961); *U. S. v. The Helen*, 164 F.2d 111, 112 (2d Cir. 1947); Gilmore & Black, *The Law of Admiralty*, § 9–10 at 601, n. 37 (2d Ed. 1975).

was explained in terms of the nature of the *in rem* proceeding. *H. Ramsdell Transportation Co. v. Louisiana Compagnie Generale Transatlantique*, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901). The court in *Winter* concluded its summary stating:

> It has never been seriously suggested that the owner of a vessel operated by a demisee is personally liable for the negligent acts of the demisee or his servants. (citing *The Barnstable, supra*; and *The China, supra*)

■ This Court holds that as between Mobil and Penrod, the primary liability for the damage to plaintiff's cable rests upon Mobil as the demise charterer and not upon Penrod as owner of the M/V WATER-BUCK.

*The Effect of the Lease Agreement and Communication Service Agreement between Mobil and Offshore*

Offshore agreed not to hold Mobil responsible for damages to Offshore's cable or other equipment due to Mobil's normal operations, although Mobil agreed to take normal precautions in this regard. As the Court has found, the damage sustained by Offshore's submerged cable was due to Mobil's normal operations. Under this clause of the lease agreement it was incumbent upon Mobil to take normal precautions to avoid damage to Offshore's cable. Mobil did take affirmative steps in compliance with its duty under the contract. However, inasmuch as it was the bareboat charterer of the M/V WATERBUCK, by operation of the doctrine of *respondeat superior,* the negligence of the M/V WATERBUCK is imputed to Mobil. Therefore, Mobil stands clothed with the negligence of the M/V WATERBUCK in not making radio contact with the pusher on the Transworld Rig 54 after being notified to do so due to obstructions in the area, and in proceeding to the rig and its movement away from the rig when it should have known that the cable

was entangled in its anchor. This conduct was a violation of Mobil's duty under this particular clause of the contract and thus would not insulate it from liability.

The determinative inquiry is whether the "hold harmless" clause in Paragraph X of the Communication Service Agreement and on page 4 of the Lease Agreement is sufficient to insulate Mobil from its negligence. These provisions provide that Offshore shall protect, indemnify and save Mobil harmless against any and all claims, demands and causes of action of every kind and character arising in favor of *any* person on account of damage to property growing out of, incident to or resulting directly or indirectly from Offshore's use of the above described property,[8] whether such loss, damage or liability arises from or is contributed to by the negligence of Mobil or its employees, or for any other cause whatsoever.

In view of the fact that Offshore constructed and maintained its submarine cable from Transworld Rig 54, the Court concludes that within the contemplation of the Lease Agreement, the damage to the cable grew out of, or resulted directly or indirectly from Offshore's use of the rig.

In *Lanasse v. Travelers Ins. Co.*, 450 F.2d 580 (5th Cir. 1971), cert. den. 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120, the court stated that in order for a party to be able to claim immunity against liability for its own negligence under an indemnity covenant, substantially less specific than the one presently before this Court, this purpose must be articulated in unmistakable terms. The Lease Agreement applicable between Offshore and Mobil specifically provided that claims for which Offshore agreed to protect, indemnify and save Mobil harmless included a claim for damages to property arising from or contributed to by the negligence of Mobil or its employees.

---

8. The use of Transworld Rig 54 by Offshore is described throughout the Lease Agreement and includes but is not limited to the installation of Offshore telephone cable risers, scaffolding, and other equipment, a right-of-way allowing access for submarine cables to and from Transworld Rig 54; to land helicopters on platform heliports; and to moor vessels to the platform mooring facilities.

In *Mills v. Fidelity & Casualty Co. of N. Y.*, 226 F.Supp. 786, 790 (W.D.La.1964), aff'd. 338 F.2d 341 (5th Cir. 1964), the court found that the purported indemnity contract did not extend to cover the negligence of the indemnitee, because the agreement did not provide in clear and specific language that the indemnitors would indemnify the indemnitee for the loss occasioned by the latter's own negligence. This principle was reaffirmed in *Todd v. James E. Dean Marine Divers, Inc.*, 325 F.Supp. 18 (E.D.La. 1971). The indemnity contract in *Todd* was very similar to the indemnity clause presently being considered by this Court. The court in *Todd* stated that where an intention to indemnify the indemnitee against losses resulting to him through his own negligence is clear and unequivocal, a contract of indemnity constitutes the law between the parties will be enforced as written. Finding that the indemnity contract in *Todd* clearly expressed such an intent, the court held:

> There can be no logical reason for ignoring, as (indemnitor) would have the Court do, the clear and unequivocal language of (the indemnity clause), specifically providing for indemnity in this case. Such a result would require a most strained and tortured construction of what appears to be a very clear and unequivocal contractual undertaking of liability by (indemnitor).[9] (325 F.Supp. at p. 22)

■ This Court concludes that the indemnity clause in the Lease Agreement and repeated in the Communications Service Agreement was sufficiently specific to cover the negligence of Mobil under the facts of this case.

Mobil is entitled to a full defense and is not found liable for the damage sustained to the Offshore submerged cable. The M/V WATERBUCK is similarly insulated from liability as a third party beneficiary to Offshore's clear and unequivocal undertaking to protect and hold Mobil harmless.

**9.** See also *EASTEX, Inc. v. Stebbins Engineering and Manufacturing Co.*, 436 F.Supp. 577 (E.D.Tex.1977) wherein the court held that a narrower indemnity clause than presented

Accordingly, for the reasons set forth in this opinion, IT IS ORDERED that JUDGMENT be and is hereby entered in favor of the M/V WATERBUCK, the M/V STATE POINT, Penrod Drilling Company, National Boat Corporation and Mobil Oil Corporation and against the plaintiff, Offshore Telephone Company.

herein was broad enough to provide indemnity for the negligence of the indemnitee's own employees.