**W. G. BUSH & COMPANY, INC., T. L. Herbert & Sons, Inc.**

v.

**SIOUX CITY AND NEW ORLEANS BARGE LINES, INC.**

v.

**Hubert R. BRUCE, d/b/a Ohio Valley Co. and Molloy Marine Service, Inc.**

**No. 76–6–NA–CV.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Aug. 23, 1977.
As Amended Sept. 6, 1977.

Waller, Lansden, Dortch & Davis, H. Barton Williams, Gracey, Madden, Cowan & Bird, Nashville, Tenn., for plaintiffs.

Frank Gorrell, Bass, Berry & Sims, Nashville, Tenn., Richard C. Roberts, Threlkeld, Whitlow & Roberts, Paducah, Ky., Cornelius, Collins, Higgins & White, Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

This is an in personam action in admiralty arising out of the transactions and events hereinafter detailed.

After seeing the witnesses and judging their credibility, the following facts are found.

Sioux City and New Orleans Barge Lines, Inc. ("Sioux City") entered into a contract with Phillip Brothers to transport phosphate from Nashville, Tennessee, to Cairo, Illinois, by barge over the Cumberland River, a navigable stream. Having a shortage of barges, Sioux City contacted a marine broker, Missouri Marine Service, and dealt with Thomas G. Ahillen ("the Broker"). The Broker then contacted a representative of Herbert R. Bruce, d/b/a Ohio Valley Co., who agreed to charter Barge OV–501B ("the Barge") to Sioux City. As was customary, an on-charter survey was made by a professional surveyor, Wayne Hendricks of Cairo Marine Service, Inc. ("Hendricks"). In addition, the Barge was inspected by Stan Kays ("Kays"), the marine superintendent of Sioux City. The two inspections revealed defects in the hull of the barge which were in most part above the water level on the barge when it was not loaded, but which would be below the loaded water level. However, at the time of the inspection, the floor of the hopper (the load carrying portion of the barge) was loaded with coal and could not be inspected. The defects so found were reported to Sioux City and Bruce. Bruce agreed to pay for the repairs to make the Barge seaworthy. Thereafter, a bare boat charter was prepar-

ed for execution by Sioux City, the Broker, and Bruce, all terms having been negotiated by the three. Prior to the sinking of the Barge as hereinafter described, Sioux City and the Broker had signed the charter but Bruce had not received the charter. After the sinking, Bruce refused to execute it. However, Bruce had authorized the Broker to sign the instrument and had fully agreed to its terms.

After the charter was negotiated, with the agreement of Sioux City, the Broker, and Bruce (acting through the Broker), the Barge was delivered to Molloy Marine Service, Inc. ("Molloy") near Paducah, Kentucky, for repair and cleaning of the hopper. Molloy was contracted by Sioux City and the Broker and advised as to the kind and extent of the work and repairs to be performed on the Barge. Kays, without any notes of his inspection, went to the facilities of Molloy and, relying only on his memory, advised its personnel of those defects in the Barge which needed repairs. He specifically advised of repairs in one wing tank. The Broker advised management personnel of Molloy in detail as to those items revealed by the marine inspection conducted by Hendricks. Molloy denies that it received this information. This court finds that Molloy was advised in specific detail.[1]

Sioux City was most anxious to have the Barge in operation as soon as possible. T. L. Herbert & Sons ("Herbert") had a tugboat which was scheduled to pass by the facilities of Molloy on a certain day. The testimony showed that if that tug could pick up the Barge on its return trip to Nashville, Tennessee, several days' time would be saved. Sioux City contacted Molloy and was advised that the repairs could be completed in time for the tug to be used but that there was not sufficient time for cleaning the hopper. Sioux City made a contract with Herbert to clean the hopper when the Barge reached Nashville and so

advised Molloy. Molloy then released the Barge as having been repaired, and it was pulled by tugboat up the Cumberland to Nashville and docked at the facilities of Herbert. Herbert then cleaned the hopper, but noticed no unusual leakage of water. The Barge was then taken to the docking facilities of W. G. Bush & Company ("Bush") for loading. The Barge was approximately one-half loaded when work ceased for the night. At 9:00 p. m. on October 16, 1975, the Barge was sitting in the water in apparent proper order. By daylight of the next morning the Barge had sunk. The sunken Barge blocked the facilities of Bush and constituted a navigation hazard. Bush and Herbert demanded that Sioux City, Bruce, and Molloy raise the Barge. On inspection, it was determined that the Barge had sunk as a result of Molloy's failure to make the specified and agreed-to repairs.

Before addressing the liability of the respective parties hereto, the court makes the following specific findings. First, the sole and proximate cause of the sinking of the Barge was the failure of Molloy to make the specified repairs which it had agreed to make. Second, neither Bush nor Herbert were guilty of any negligence which proximately or remotely contributed to the sinking.

As to the first finding above, there was no credible proof adduced at trial as to the competency of Molloy in its field. Nor was there any credible proof that Sioux City, the Broker, and Bruce were negligent in selecting Molloy to make the repairs necessary to put the Barge in seaworthy condition. There was no credible proof that Sioux City, the Broker, or Bruce were aware or should have been aware of Molloy's failure to fulfill its contract to make the necessary repairs. The fact that time was of the essence has no bearing on the failure of Molloy to perform its duty. In

1. It is of particular interest that another barge, in addition to Barge OV–501B, was discussed with Molloy in this one conversation. Molloy was able to find and did produce its record of detailed instructions as to specific defects in the other barge, but could not produce such record as to Barge OV–501B. The testimony of the Broker, who kept and produced detailed notes of each step of the transaction, was most convincing.

fact, Molloy, by releasing the Barge after its conversation with Sioux City, tacitly represented that the necessary repairs had been made.

As to the second finding above, there was no credible proof that Herbert should have, while cleaning the hopper, discovered the unseaworthiness of the Barge. Herbert was not hired to inspect or repair the Barge. It received the Barge after it had allegedly been made seaworthy by Molloy. It is significant that the major defects were located above the water line of the Barge when empty. It also is pertinent to note that cleaning a hopper is customarily a task performed by common labor and not by marine inspectors. No credible proof was offered that a contract to clean a hopper entails an inspection for structural defects by knowledgeable personnel. The court is likewise not convinced by the proof that any leak in the hopper could, or did, cause the sinking.

It has been asserted that Bush, as a bailee, was negligent in failing to inspect the Barge between 9:00 p. m. and daylight of the next day. No credible proof as to the standard of care for bailees in the marine industry in the Nashville or southeast area was introduced. Some general impressions of what was personally considered appropriate were offered but this court rejects them. What one person or one concern might or might not do does not constitute a custom, standard, or norm. There is nothing in the testimony which shows any negligence by Bush in its handling of the Barge. There is no evidence that Bush had knowledge of any facts which did or should have put it on notice of any impending problem with the Barge. This record reveals that it handled the Barge in its normal and customary manner. There is no evidence, as above stated, that this conduct did not meet the standard of the industry.

## RELIEF SOUGHT

By the original complaint, Herbert sought recovery from Sioux City for the blocking of the Herbert terminal, the cost of raising the Barge, revenue loss and related expenses totaling $26,651.62, plus $25,-000.00 in punitive damages. By amended complaint, Bush was joined as a party plaintiff upon the allegation that Herbert was the wholly owned subsidiary of Bush.

Sioux City filed a third-party complaint against Bruce (d/b/a Ohio Valley Company) and Molloy, seeking to pass to those defendants any liability attaching to Sioux City.

Sioux City also filed a counterclaim against plaintiffs, alleging that the loss was due to plaintiffs' negligence. Sioux City filed a cross-claim against Bruce and Molloy.

## JURISDICTION

Jurisdiction of this court is not questioned by Bush, Herbert, Sioux City, or Bruce. However, Molloy questions the in personam jurisdiction.

To reach the issue raised by Molloy, certain basic determinations must be made.

■ A contract to repair a ship (barge) is maritime. *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); *Sicula Oceanica, S. A. v. Wilmar Marine Eng'r & Sales Corp.*, 413 F.2d 1332 (5th Cir. 1959); *Alcoa S. S. Co. v. Charles Ferran & Co.*, 383 F.2d 46 (5th Cir. 1957), *cert. denied*, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107; *Houston-New Orleans, Inc. v. Page Eng'r Co.*, 353 F.Supp. 890 (E.D. La. 1972).

■■ Courts sitting in Admiralty have personal jurisdiction over any defendant sued in personam whom the courts can reach by process. Since 1966, civil and admiralty practice have been united. Thus, Rule 4 of the Federal Rules of Civil Procedure applies to actions in personam. *H & F Barge Co. v. Garber Bros.*, 65 F.R.D. 399 (E.D. La. 1974); *Chilean Line, Inc. v. United States*, 344 F.2d 757 (2d Cir. 1965); *McKee v. Brunswick Corp.*, 354 F.2d 577 (7th Cir. 1965); *Bartlett-Collins Co. v. Surinam Navigation Co.*, 381 F.2d 546 (10th Cir. 1967); *Nimpex Int'l, Inc. v. S. S. Monksgarth*, 342 F.Supp. 510 (N.D. Ill. 1971).

Rule 4(c) encompasses service under the state "long arm" statute. In the case at bar, process was issued, served by the U. S. Marshal on the Secretary of State of Tennessee, and processed by that official pursuant to T.C.A. § 20–235. Molloy does not challenge the mechanics of service, but asserts that it did not have the minimum contacts with the State of Tennessee constitutionally required for the validity of the service.

If jurisdiction is predicated on diversity, the minimum contact principle likewise applies.

■ Whether the claim against Molloy be treated as arising in admiralty or being a diversity matter, since service is attempted through a state statute, that statute must be examined in order to determine its scope.

T.C.A. § 20–235 provides as follows:

"20–235. Jurisdiction of persons unavailable to personal service in state—Classes of actions to which applicable.—Persons who are nonresidents of Tennessee and residents of Tennessee who are outside the state and cannot be personally served with process within the state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:

(a) The transaction of any business within the state;

(b) Any tortious act or omission within this state;

(c) The ownership or possession of any interest in property located within this state;

(d) Entering into any contract of insurance, indemnity, or guaranty covering any person, property, or risk located within this state at the time of contracting;

(e) Entering into a contract for services to be rendered or for materials to be furnished in this state.

(f) Any basis not inconsistent with the constitution of this state or of the United States.

"Person" as used herein shall include corporations and all other entities which would be subject to service or process if present in this state. Any such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner above described through an agent or personal representative.

T.C.A. § 20–235 was amended by the addition of subsection (f) in April of 1972. Subsections (a) through (e) all contain the limitation "within this state" or "in this state."

However, with the addition of subsection (f), the Tennessee legislature expanded the jurisdiction of the courts in Tennessee to "any action or claim for relief arising from . . . any basis not inconsistent with the constitution of this state or of the United States." The language of the statute is clear. There is no mention of any "within the state" limitation in subsection (f), and it is only logical to assume that it was the intent of the legislature not to include such a restriction in that subsection.

The available legislative history on subsection (f) is scanty.[2] The bill adding subsection (f) to T.C.A. § 20–235 (Senate Bill No. 1640, Public Acts Ch. 689, § 1) was apparently passed in the Senate without discussion. Representative Burnett, in introducing the bill in the House, stated:

. . . primarily what this bill does is expand the right of our Tennessee citizens to bring suit under our long arm statute against nonresidents outside of the state. As you know, we have a long arm statute in Tennessee, and some of our local court decisions have somewhat thwarted the effect of that by limiting the use of that particular section. This bill will do no more than give the Tennessee citizens—the people of our state—the right to additional process *and additional*

---

**2.** There is no record in the Tennessee State Archives of any Committee meetings or discussions with regard to this bill. The court is informed by officials at the Archives that, ex-

cept for the statement by Mr. Burnett, *infra*, there is no other material available which would shed light on the legislative intent of this bill.

*reasons for service of process* in accordance with the Constitution of the United States. (Tennessee Archives, Legislative Recordings, April 4, 1972, H–195) (emphasis supplied).

■ Additionally, T.C.A. § 20–240 provides that the long arm statute is remedial in nature and is to be liberally construed. Thus, the clear language of the statute, its legislative history, and the provisions of T.C.A. § 20–240 convince this court that subsection (f) expands the jurisdiction of Tennessee courts under T.C.A. § 20–235 to the full constitutionally permissible limits. This conviction is supported by the Tennessee Supreme Court's language in *W. B. Dunavant & Co. v. Perkins*, 498 S.W.2d 905, 909 (Tenn. 1973), to the effect that:

. . . under paragraph (f), the courts of this state have jurisdiction to the full extent constitutionally permitted.

*See also Barnhart v. Madvig*, 526 S.W.2d 106 (Tenn. 1975).

Federal courts have likewise interpreted subsection (f) as expanding the long arm statute to its constitutional limits. In *Walker v. Kawasaki Motors Corp.*, 62 F.R.D. 607, 610 (E.D. Tenn. 1973), Judge Taylor noted: "This addition, therefore, made clear the legislative intention to extend the Tennessee Act, for all purposes, to the limits of the Due Process Clause."

The Supreme Court of the United States has decided five cases which are of significance in delineating the limits placed upon in personam jurisdiction by the Due Process Clause. These cases, sometimes referred to as "the long arm quintet" [see *Gelineau v. New York Univ. Hospital*, 375 F.Supp. 661 (D. N.J. 1974)] include: *International Shoe Co. v. Washington*, 326 U.S. 210, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950); *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and *Hanson v. Denckla*, 347 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

*International Shoe Co., supra*, is the leading case in establishing the boundaries within which states may exercise jurisdiction over nonresident defendants. In that case, the Supreme Court set forth the "minimum contacts" test, which represents the accepted approach to jurisdictional due process questions:

. . . due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

326 U.S. at 316, 66 S.Ct. 154, 158.

This test, while instructive, is incapable of precise definition. *Prior to the addition of subsection (f)*, the Sixth Circuit Court of Appeals, in reference to T.C.A. § 20–235, formulated the following three-pronged test for determining the outer limits of in personam jurisdiction based on a single act:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Company v. Mahasco Industries, Inc.*, 401 F.2d 374, 381 (6th Dir. 1968)

It is important to note that at the time of the *Mohasco* decision, T.C.A. § 20–235 was a "single act" statute. The *Mohasco* court specifically recognized this, as indicated in the following language:

In considering this Act, we can put to one side cases where the activities of a corporation are sufficient to justify the assumption of jurisdiction even for causes of action arising outside the forum state. Cf. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). The Tennessee Long

Arm Statute is a "single act" statute by which the State only purports to assume jurisdiction over causes of action arising out of the defendant's activities in the State.

401 F.2d 377

■ As noted previously, with addition of subsection (f), the Tennessee long arm statute was changed from a "single act" statute to a "minimum contacts" statute. The amount and kind of activities which must be carried on by the foreign resident in the forum state under such a statute, so as to make it reasonable and just to subject the corporation to the jurisdiction of that state, should be determined according to the particular facts in each case. *Perkins v. Benguet Consol. Mining Co., supra. See also Velandra v. Regie Nationale des Usines Renault,* 336 F.2d 292 (6th Cir. 1964). The test is one of "general fairness" to the nonresident, *Perkins v. Benguet, supra,* at 445, and this must of necessity involve some subjective value judgment by the courts.

Nonetheless, it is possible to define certain elements which should be considered in determining whether the requisite "minimum contacts" are present in a given case. The following remarks by Judge Blackmun (now Mr. Justice Blackmun) are of assistance in this respect:

> . . . at one time or another in the opinions, three primary factors, namely, the quantity of the contacts, the nature and quality of the contacts, and the source and connection of the cause of action with those contacts, are stressed, and . . . two others, interest of the forum state and convenience, receive mention. . . . The Supreme Court has certainly not indicated that all five of these factors must be present in substantial degree for jurisdiction to be constitutionally effected.

*Aftanase v. Economy Baler Co.,* 343 F.2d 187, 197 (8th Cir. 1965). *See also Odom v. Thomas,* 338 F.Supp. 877 (S.D. Tex. 1971) (citing these criteria for the minimum contacts test).

Before examining the facts in the case *sub judice,* a passage in the case of *Hanson v. Denckla, supra,* should be considered:

> . . . but it is essential in each case that there be some act by which the defendant *purposefully avails itself of the privilege of conducting activities within the forum state,* thus invoking the benefits and protection of its laws.

357 U.S. at 253, 78 S.Ct. at 1240 (emphasis supplied).

■ What contacts did Molloy have with Tennessee? By contract with a nonresident of Tennessee, it agreed to repair a barge. This Barge could have been used on any navigable waterway of the United States or the world. The evidence reveals that Molloy knew of the intention to bring the Barge into Tennessee waters. It is obvious, however, that that intent—over which Molloy had no control—could have changed. Had the Barge sunk before it came into Tennessee, what contacts could have been pointed to as the basis for service of process? This court feels that the repair of a barge is essentially a local matter which, in and of itself, has insubstantial connection with any of the numbers of locations which might be touched by the barge in its future use. Certainly Molloy had no intention of conducting any activities in the State of Tennessee. Fundamental fairness, logic, and good sense would be violated if a repairman were subjected to service of process in a foreign state simply because the product of his labor were subsequently carried by another, on the business and for the benefit of someone other than the repairman, to that state.

■ Constitutionally, the line must be drawn somewhere. In the instant case, this court draws it so as to hold that Molloy did not have the requisite constitutional minimum contacts in the State of Tennessee. Thus, this court has no in personam jurisdiction over Molloy and as to it the case must be dismissed.

Bruce, through the Broker, entered into a bare boat charter with Sioux City. Even though Bruce did not sign the written instrument, it was signed by the Broker who was his authorized agent. In addition,

Bruce had orally agreed to its terms. The sinking occurred before the document reached Bruce and he thereafter refused to sign it. This does not constitute credible evidence that Bruce would not have signed the instrument had it been delivered before the sinking. Bruce was aware that repairs were required to make the vessel seaworthy, and he agreed to pay for those repairs.

The charter party contained an express warranty of seaworthiness. Even had it not, however, there would have been an implied warranty to that effect. Gilmore & Black, *The Law of Admiralty* § 4–5 *(2d ed. 1975); Jordan v. Mayronne Drilling Mud, Chem. & Eng'r Serv.*, 214 F.2d 410 (5th Cir. 1954).

■■■ Bruce, through the Broker, agreed for Molloy to repair the vessel. Molloy was to perform the obligation of Bruce to put the Barge in a seaworthy condition. The obligation of Bruce to furnish a seaworthy vessel could not be delegated to another so as to relieve Bruce. *See Martin v. The Southwark*, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903); Gilmore & Black, *The Law of Admiralty* § 4–22 (2d ed. 1975). As a result of his failure to furnish a seaworthy vessel, Bruce became liable for all damages which proximately flowed from such failure. Thus, Bruce is liable to Sioux City to the extent of the losses suffered by the latter.

■■■ When Sioux City accepted this demise pursuant to a bare boat charter, it became the owner of the Barge *pro hac vice* as to third persons. Gilmore & Black, *The Law of Admiralty*, Ch. IV § 4–23, p. 242; *Leary v. United States*, 81 U.S. (14 Wall.) 607, 20 L.Ed. 756 (1871); *The Barnstable*, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901). Thus, as to the plaintiffs, Bush and Herbert, Sioux City had delivered to them for loading an unseaworthy barge. As owner *pro hac vice* he represented that it was seaworthy. At the instructions of Sioux City they loaded the Barge. It sank and blocked the terminal and its facilities.

Herbert and Bush raised it at a cost of $6,203.97 and $9,336.33, respectively. Due to the blockage of its terminal, Bush lost $2,206.00 in revenue.

Sioux City paid Phillips Brothers the sum of $11,500.00 for the cargo.

33 U.S.C. § 409 places a mandatory duty on the owner to immediately raise a vessel which has sunk in a navigable channel through carelessness. This Barge was negligently allowed to sink by virtue of its use in an unseaworthy condition. Both Sioux City and Bruce on notification were asked to raise the vessel, and each declined. Bush and Herbert performed the obligation of the "owner." It was necessary for them to do so in order to use the terminal and to continue to operate. They were not volunteers.

■■■ It is the decision of this court that Sioux City, as owner *pro hac vice*, and Bruce, as actual owner of the Barge, were by law obligated to remove the obstruction in the navigable stream. However, as between Sioux City and Bruce, the primary obligation was on Bruce. *See generally, Wyandotte Trans. Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *In Re Pacific Far East Lines, Inc.*, 314 F.Supp. 1339 (N.D. Cal. 1970), *aff'd*, 472 F.2d 1382 (9th Cir. 1973); *United States v. Chesapeake & Delaware Shipyard, Inc.*, 369 F.Supp. 714 (D.Md.1974).

The plaintiffs have asserted that Sioux City and Bruce are liable for punitive damages. The court finds that the credible evidence does not justify the award of this type of damages. While it is true that both Sioux City and Bruce were aware at the time of the charter that the vessel was unseaworthy, both expected it to be repaired by Molloy. The record in this cause fails to reveal sufficient evidence to reflect on Molloy's competence or reputation in making repairs.[3] It is true that neither Sioux City nor Bruce inspected the Barge after the repairs were allegedly made.

---

3. No issue was made as to the competency of Molloy and no credible evidence was introduced showing whether or not Molloy was or was not competent to make the requested repairs.

However, the record fails to reflect any conduct justifying an award of punitive damages.

An order will be entered awarding a judgment in favor of plaintiff against Sioux City for the sum of $17,746.30. Sioux City will be awarded a judgment against Bruce for the sum of $11,500.00 and a further judgment over against Bruce for an additional sum of $17,746.30 on Sioux City's payment of the judgment to plaintiffs.

The claims against Molloy and the plaintiffs will be dismissed.